**Karl KALLMANN, d/b/a Love's Barbeque Restaurant, No. 62, Petitioner and Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent and Cross-Petitioner.**

Nos. 79–7595, 80–7075.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 13, 1980.

Decided March 30, 1981.

Van Bourg, Allen Weinberg & Roger, San Francisco, Cal., Naomi Young, Littler, Mendelson, Fastiff & Tichy, Los Angeles, Cal., for petitioner and cross-respondent.

Linda Dreeben, NLRB, Washington, D. C., for respondent and cross-petitioner.

David H. Rosenfeld, San Francisco, Cal., for intervenor, Hotel, Motel, Restaurant and Bartenders Union, Local 50.

Before GOODWIN and BOOCHEVER, Circuit Judges, and HARRIS *, District Judge.

BOOCHEVER, Circuit Judge:

Karl Kallmann, d/b/a Love's Barbeque Restaurant (Kallmann), seeks to review and set aside an order of the National Labor Relations Board (Board). The Board cross-petitions for enforcement of its order. The Board found that Kallmann was a successor to Love's Wood Pit Barbeque Restaurant (Love) and that Kallmann had violated section 8(a) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a), by refusing to hire the former Love employees because of their union affiliation and by harassing the former employees during their picketing of Kallmann's restaurant. Consequently, the Board ordered that all forty former employees be reinstated and given back pay. We affirm the part of the Board's order finding violations of the Act, but remand for further proceedings on reinstatement and back pay.

*STATEMENT OF FACTS*

The Hotel, Motel & Restaurant Employees & Bartenders Union (Union), intervenors in this suit, filed an unfair labor practice suit against Love and Kallmann. The following facts were presented at a hearing before an Administrative Law Judge (ALJ).

Love, a California corporation, operates and franchises restaurants. Love opened Love's Wood Pit Barbeque Restaurant (Restaurant) as a franchise. From 1973 until September 1977 Love operated it as a company-owned restaurant. In 1977, a collective bargaining agreement was in effect between the Union and Love.

In May of 1977, Ronald Mesker, Love's Vice President, spoke with Kallmann regarding the possibility of purchasing the Restaurant. Mesker informed him that Love had a collective bargaining agreement with the Union covering employees at the Restaurant. Franchising negotiations continued during the summer. Love closed the Restaurant at the end of the business day on September 25. The employees were first notified of the closure on September 26. On September 28, Kallmann and Love entered an agreement under which Kallmann became the owner of the Restaurant on a franchise basis.

While the Restaurant was being cleaned, Kallmann prepared to reopen. He rented two rooms at a hotel for interviewing job applicants and advertised at two local colleges and in two newspapers. He interviewed at the hotel for two and one-half days, commencing on October 12. Thereafter, he interviewed at the Restaurant and the advertisements were changed so that the name and address of the Restaurant were provided for the first time. Kallmann conducted all the interviews at the hotel, but David Sebben, assistant manager, conducted some at the Restaurant.[1] Of the 200 applicants, 125 were interviewed. Before October 17, all available positions were filled.

Seven former employees of the Restaurant applied for positions, but none was hired. Each indicated on the employment application that he or she was a former employee. The seven were: Malone-Morris, Porter, Hansen, Boyd, Logan, Wadsworth and Bishop.[2] Of these seven, four were interviewed.

Porter applied to be a waiter or cook (he had been the head cook). Kallmann testi-

---

* The Honorable Oren Harris, Senior District Judge, Eastern and Western Districts of Arkansas, sitting by designation.

1. Kallmann testified, however, that Sebben did not interview anyone.

2. Shawver applied after the Restaurant opened. Roy inquired about employment as a hostess, but Sebben told her the position was filled. Although she did not fill out an application immediately, she testified that on the day the Restaurant reopened she left an application with the hostess.

fied that although he initially thought that Porter might be a good employee, he subsequently remembered the filthy condition of the kitchen and decided that he did not want that type of employee working for him.

Wadsworth and Logan applied for both dishwasher and cook jobs. Logan testified that after Kallmann read that Logan had previously worked at the Restaurant, Kallmann indicated that there were no positions open except possibly as a dishwasher. After Logan said that he would take a job as a dishwasher, Kallmann told him that he was pretty certain that it was taken. Wadsworth was offered a job as a busboy, but told Kallmann that he was not interested because his seniority warranted a better job. Hansen stated that after she told Kallmann that she had worked at the Restaurant, he exclaimed, "Oh, you were one of them." Kallmann said that he would check her qualifications.

Kallmann initially hired approximately thirty employees, but no former employees were hired. Kallmann established new wage rates and other benefits for his employees. They were lower than those provided to the former employees.

On October 21, the day after the Restaurant reopened, the Union commenced picketing the Restaurant. Although the Union wanted to negotiate a contract, Kallmann declined to discuss the matter. Pingree, a former employee, testified that while she was picketing, Kallmann asked her to lay down her sign and come to work. He said that he would hire her at Union wages, "but it would not be Union."

After the picketing had concluded one day, Logan and Wadsworth were sitting in a car parked near the Restaurant. Sebben, the assistant manager of the Restaurant, testified that he took their picture because he saw the pair rolling what he believed to be marijuana cigarettes.

**3.** Section 8(a)(1), 29 U.S.C. § 158(a)(1), provides:
(a) It shall be an unfair labor practice for an employer—

The ALJ concluded that: (A) by telling employees he did not intend to operate a unionized restaurant and taking pictures, without a valid reason, of employees who had been picketing, Kallmann violated section 8(a)(1) of the Act; (B) Kallmann was not a "successor" to Love; and (C) Kallmann had not violated sections 8(a)(3) and (5) of the Act. Both sides filed exceptions to the decision of the ALJ. The Board upheld the ALJ's decision that Kallmann had violated section 8(a)(1) by its actions during the picketing. It reversed the other findings and concluded that: (A) Kallmann was a successor employer, and therefore violated sections 8(a)(1) and (5) when he refused to recognize and bargain with the Union, and (B) by refusing to hire the former employees because of their Union affiliation, Kallmann violated sections 8(a)(1) and (3). Kallmann petitioned for review of the Board's order and the Board filed a cross-application for enforcement.

## A. KALLMANN'S ACTIVITIES DURING THE PICKETING

Kallmann contends that his statement to Pingree and Turner, that he would hire Pingree under the same conditions as before but that the Restaurant "will not be Union," is not a violation of section 8(a)(1)[3] because it was one of fact and one expressing his view and opinion of the status at the time the statement was made. Section 8(c) protects such an expression if it "contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c).

Kallmann, however, was not merely expressing a view of the status at the time he made the statement. One reasonable inference from the remark is that the Restaurant would remain non-union in the future. Moreover, the statement promised Pingree that benefits (i. e., union wages) would be provided even without union protection.

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

[S]tatements ... made to employees informing them that the company would never bargain with the union and that benefits would be given by the company even without the union .... violated section 8(a)(1) ....

*Ingress-Plastene, Inc. v. N.L.R.B.*, 430 F.2d 542, 545 (7th Cir. 1970). There was sufficient evidence from which the Board could find a violation of section 8(a)(1).[4] *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951) (substantial evidence test for agency findings).

■ Kallmann next contends that Sebben's photographing of Logan and Wadsworth was not a violation of section 8(a)(1) because it was to show that they were rolling a marijuana cigarette, not to harass them for union activity. Neither the ALJ nor the Board, however, believed Sebben's testimony. Thus, there is no basis for overruling the finding that Sebben's actions violated section 8(a)(1). The Board reasonably concluded that such conduct subjected the former employees to harassment.[5]

### B. KALLMANN'S FAILURE TO HIRE ANY FORMER EMPLOYEES

The ALJ found that Kallmann did not deliberately refuse to hire the former em-

ployees because of their union affiliation. The Board, however, reversed this finding thereby concluding that Kallmann violated sections 8(a)(1) and (3).[6]

■ Kallmann contends that the Board's finding is not supported by substantial evidence. Moreover, he contends that where, as here, the Board disagrees with the ALJ's findings the evidence supporting the Board's determination must be stronger. This court has rejected Kallmann's second contention.

The fact that the Board's findings disagree with those of the ALJ does not change this [substantial evidence] standard. The deference accorded to the findings runs in favor of the Board, not the ALJ. It is well settled that we may not substitute our choice between two fairly conflicting interpretations of the facts where the Board's choice is supported by substantial evidence. True enough, the ALJ's determinations on credibility "weigh heavily" in the court's review of the Board's findings contrary to the ALJ's. However, ... the Board is to be accorded special deference in drawing derivative inferences from the evidence.

*N.L.R.B. v. Tischler*, 615 F.2d 509, 511 (9th Cir. 1980) (citations omitted).[7]

---

**4.** *See N.L.R.B. v. Max Factor and Co.*, 640 F.2d 197 at 204 (9th Cir. 1980) ("[E]mployer violates section 8(a)(1) by offering economic benefits in exchange for ceasing union activity."); *N.L.R.B. v. Interstate 65 Corp.*, 453 F.2d 269, 274 (6th Cir. 1971) (manager's statement that "there would be no union at the motel" and conditioning employment on willingness to work without a union was sufficient to support violation of § 8(a)(1)). *Cf. Overnite Transportation Co. v. N.L.R.B.*, 372 F.2d 765, 769 (4th Cir.), *cert. denied*, 389 U.S. 838, 88 S.Ct. 59, 19 L.Ed.2d 101 (1967) (company's statement that "we are not union and we are not planning on being union" was not per se impermissible, but it colored the conduct). *See generally, N.L.R.B. v. Fort Vancouver Plywood Co.*, 604 F.2d 596, 599 n.1 (9th Cir. 1979) *cert. denied*, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980) (even if the statements were capable of noncoercive interpretation, this court will not weigh differing interpretations as long as the inference drawn by the Board is reasonable).

**5.** In the absence of proper justification, the photographing of pickets violates the Act because it has a tendency to intimidate. *See N.L.R.B. v. Associated Naval Architects, Inc.*, 355 F.2d 788, 791 (4th Cir. 1966).

**6.** Section 8(a)(3) makes it an unlawful labor practice for an employer:

by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization....

29 U.S.C. § 158(a)(3).

**7.** When, however, testimonial inferences (credibility determinations based on demeanor) are at issue, the Board's finding will not be sustained when it rests solely on testimony discredited by the ALJ. Even if there is independent evidence, the Board's finding will be more carefully scrutinized. *Loomis Courier Serv., Inc. v. N.L.R.B.*, 595 F.2d 491, 495–96 (9th Cir. 1979). For an extensive discussion of this issue, see *Penasquitos Village, Inc. v. N.L.R.B.*, 565 F.2d 1074 (9th Cir. 1977). It has been

Even though the ALJ believed that "Kallmann was not a credible witness when testifying with respect to this very subject [the hiring procedure]," the ALJ found that Kallmann did not refuse to hire the former employees because of their union affiliation. The ALJ based this finding on several factors. First, there was no basis for concluding that any problems between the Union and Love had been brought to Kallmann's attention so that he would be reluctant to hire employees with union sympathies. Second, although Kallmann's testimony was not generally credible, he did appear credible when he stated his belief that when he took over the Restaurant, it would be his choice whether or not there was a union. Thus, Kallmann had no reason to refuse to hire union employees. Third, Kallmann did not refuse employment to all former employees because Wadsworth, and probably Logan, were offered jobs as busboys. Fourth, even though Kallmann's initial advertisements did not list the name of the Restaurant, Kallmann did not interview at the Restaurant during the initial two and one-half days of interviewing, and Kallmann did not give an explanation for these procedures, the ALJ refused to infer that Kallmann was attempting to conceal the reopening from the former employees. Fifth, Kallmann had a valid business reason for not hiring former employees because he felt that the Restaurant had been left in a dirty condition.

The Board noted that although the ALJ discredited Kallmann's testimony regarding the hiring procedures, the ALJ nevertheless refused to draw the permissible inference that the hiring actions were taken for an unlawful reason—to conceal the reopening. Finding that Kallmann had deliberately refused to hire the former employees because of anti-union animus, the Board took a contrary view. First, Kallmann's statement that he did not intend to let the employees be represented, far from being a mere opinion, supported a finding of unlawful motive. Second, the Board found that Kallmann's "unusual" hiring procedures, which he failed to explain, were designed to conceal the availability of jobs from the former (Union) employees. Third, it also found that Kallmann made no "offers" to former employees because: (A) the offer to Pingree was itself a violation of the Act; (B) the offer of a "possible" busboy position to Wadsworth was not an offer since it was merely an "expression of a possible potential offer" which Kallmann never actualized, and in any event he knew that Wadsworth applied for the cook position; and (C) there was no basis for inferring that Kallmann offered Logan a position.[8] Fourth, the Board found that there was no valid business reason for not hiring the former employees because Kallmann did not offer the uncleanliness of the Restaurant as a defense at the proceedings before the ALJ.[9] Finally, it noted that Kallmann had violated the Act by photographing picketers and making unlawful statements.

The Board did not disagree with the ALJ's assessment of witness credibility,[10] rather it drew different inferences from the testimony itself. The Board has special expertise in drawing these kinds of inferences, and its determinations are entitled to judicial deference. *N.L.R.B. v. Tischler*, 615 F.2d 509, 511 (9th Cir. 1980).

stated that " '[w]hile the standard set forth ... is imprecise, it provides as much clarity as the area affords.' " *Id.* at 1087 (Duniway, J., concurring in part and dissenting in part) (quoting *N.L.R.B. v. Interboro Contractors, Inc.*, 388 F.2d 495, 499 (2d Cir. 1967)).

**8.** The ALJ reasoned that because Logan was interviewed at the same time as Wadsworth and Wadsworth was offered a job, Logan was offered a job.

**9.** There was little testimony regarding the Restaurant's cleanliness. The ALJ apparently re-

lied on Kallmann's asserted justification for not hiring Porter.

**10.** The ALJ discredited Kallmann's testimony, although the ALJ did believe his testimony regarding his belief that it was his choice whether there would be a union. In reaching its conclusions, the Board did not disagree with the ALJ's assessment of that testimony but drew a different inference, namely that Kallmann, in violation of the Act, did not intend to allow a union.

■ The record as a whole indicates that the Board's finding that Kallmann refused to hire former employees because of their union affiliation is supported by substantial evidence. Kallmann's discriminatory refusal to hire constituted a violation of sections 8(a)(1) and (3). *N.L.R.B. v. Tragniew, Inc.,* 470 F.2d 669, 675 (9th Cir. 1972); *K. B. & J. Young's Super Markets, Inc. v. N.L.R.B.,* 377 F.2d 463, 465 (9th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 71, 19 L.Ed.2d 105 (1967).

## C. KALLMANN AS A SUCCESSOR EMPLOYER

■ When employees have a collective bargaining agreement and a change in ownership occurs, the new owner must recognize and bargain with the employees' union if the new owner is found to be a "successor employer." *N.L.R.B. v. Edjo, Inc.,* 631 F.2d 604, 606–607 (9th Cir. 1980); *Bellingham Frozen Foods, Inc. v. N.L.R.B.,* 626 F.2d 674, 678 (9th Cir. 1980). The new owner is a successor employer if: (A) the employer conducts essentially the same business as the former employer, and (B) a majority of the new employer's work force are former employees or would have been former employees absent a refusal to hire because of anti-union animus. *Id.; Pacific Hide & Fur Depot, Inc. v. N.L.R.B.,* 553 F.2d 609, 611 (9th Cir. 1977). The Board found that Kallmann was a successor employer who violated sections 8(a)(1) and (5) [11] by disavowing Love's obligation to the Union.

Kallmann concedes that he conducted essentially the same business as Love. He argues, however, the Board erred in finding that he was a successor employer because the Board impermissibly assumed that "but for ... Kallmann's unlawful ... [hiring]

discrimination], the Union's status as the exclusive collective-bargaining representative would have survived ... Kallmann's take over of the Hayward Restaurant." Kallmann contends that this "bootstrap argument" cannot be made without some evidence that Kallmann would have had the opportunity to hire the requisite number of former employees in the absence of his allegedly unlawful conduct. At most, only nine former employees applied for the twenty-eight to thirty available positions. Therefore, Kallmann contends that there was not substantial evidence to find that the Union's majority status would have continued.

■ Kallmann's argument has been rejected by several courts.[12] For example, in *N.L.R.B. v. Foodway of El Paso,* 496 F.2d 117 (5th Cir. 1974), Foodway purchased a grocery store from Allied. Foodway refused to hire any former Allied employees because of their union memberships. Foodway contended that it was not a successor employer with a duty to bargain because the evidence did not show that the union represented a majority of the employees. The court rejected this argument stating:

> It is manifest that but for Foodway's discriminatory refusal to offer employment to Allied's unit employees, the Union would have continued to enjoy a majority representative status. We decline to permit an employer to rely upon its own wrongdoing and thus avoid its legal responsibilities.

*Id.* at 120. Where, as here, a successor employer unlawfully discriminates in hiring, an appropriate remedy is reinstatement for all the former employees. *Packing*

---

**11.** Section 8(a)(5) provides that it is unlawful for an employer:

> to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title. 29 U.S.C. § 158(a)(5).

**12.** *See Packing House and Indus. Services, Inc. v. N.L.R.B.,* 590 F.2d 688, 695 (8th Cir. 1978); *N.L.R.B. v. Houston Distribution Serv., Inc.,* 573 F.2d 260, 266–67 (5th Cir.), *cert. denied,* 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 705

(1978). *See generally N.L.R.B. v. Foodway of El Paso,* 496 F.2d 117, 120 (5th Cir. 1974); *K. B. & J. Young's Super Markets, Inc. v. N.L.R.B.,* 377 F.2d 463 (9th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 71, 19 L.Ed.2d 105 (1967) (majority status may be presumed where successor employer discharged former employees to evade bargaining obligations); *Barrington Plaza* and *Tragniew, Inc.,* 185 N.L.R.B. 962 (1970), *enforced in part, N.L.R.B. v. Tragniew, Inc.,* 470 F.2d 669 (9th Cir. 1972).

House and Industrial Services v. N.L.R.B., 590 F.2d 688, 697–98 (8th Cir. 1978). *See N.L.R.B. v. Tragniew, Inc.,* 470 F.2d 669, 675 (9th Cir. 1972).

> With such reinstatement ordered, continuity in the identity of the work force may be presumed to follow and an order to recognize and bargain with the union as representative of the present work force is appropriate.

*K. B. & J. Young's Super Markets, Inc. v. N.L.R.B.,* 377 F.2d 463, 465 (9th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 71, 19 L.Ed.2d 105 (1967). The Board properly assumed a majority would have survived the takeover but for Kallmann's discrimination. We conclude that substantial evidence supports the Board's finding that Kallmann was a successor employer and thus violated the Act by refusing to bargain with the Union.[13]

### D. THE BOARD'S ORDER OF REINSTATEMENT

Kallmann contends that the portion of the Board's order directing him to reinstate the forty former employees to their old jobs, or to substantially equivalent jobs if the old jobs no longer exist, and to make them whole for any loss of earnings suffered as a result of the discrimination, is punitive and therefore unenforceable. *See N.L.R.B. v. Fort Vancouver Plywood Co.,* 604 F.2d 596, 602 (9th Cir. 1979), *cert. de-*

*nied,* 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980).

The Board's order requires Kallmann to offer all forty former employees reinstatement. Kallmann argues that this is punitive because he only hired twenty-eight to thirty total employees when he reopened the Restaurant.[14] Kallmann relies on *Vancouver, id.* In *Vancouver,* the company was a worker-owned corporation. Not all the workers, however, were shareholders. Three of the seven directors (also worker-shareholders) advocated ending the employment of non-shareholders altogether. Eventually, the three convinced another director to join with them and on that day all seventy-two non-shareholders then employed were fired. The court upheld the Board's findings that the firings were for anti-union reasons and that the company unlawfully refused to recognize the non-shareholders' union. The court refused to enforce, however, the Board's remedial order, similar to the order here, that required the rehiring of all seventy-two non-shareholders. The company contended that eventually it would have eliminated or drastically reduced the non-shareholder work force regardless of unionization, and therefore the Board improperly gave the discharged employees more than they would have received without the violation. The court agreed, stating:

13. Kallmann's reliance on *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), is misplaced. In *Teamsters,* the employer committed unlawful discrimination in failing to promote minority employees to certain preferred truck driving positions. The government contended that since all non-applicants were employees, it is likely that they were aware of the futility of applying and, absent the prospect of discriminatory rejection, they would have applied. The court rejected this argument because there were such differences between the "preferred" jobs (those that paid more) and the others that "the desirability of the [former] is not so self-evident as to warrant a conclusion that all employees would prefer [the preferred job] if given a free choice." *Id.* at 369, 97 S.Ct. at 1871–1872. Because the Supreme Court pointed out that Title VII remedies are modeled after the National Labor Relations Act, *id.* at 366, 97 S.Ct.

at 1870, Kallmann contends that the reasoning of *Teamsters* is applicable to this situation. Here, however, it is reasonable to assume that the former employees would have desired to remain in their existing jobs at the same benefit level. The *Teamsters* court also noted that the non-applicants might not have possessed the necessary qualifications. *Id.* at 369, 97 S.Ct. at 1871–1872. Here, it is proper to assume that the former employees were qualified to perform the jobs they previously held.

14. We reject the Board's contention that Kallmann has waived the right to raise this argument on appeal because Kallmann, as the prevailing party before the ALJ, had no remedial order to object to before the Board. *See AM-CAR Division v. N.L.R.B.,* 596 F.2d 1344, 1350 n.8 (8th Cir. 1979).

[T]he Board has a duty to consider how many employees, if any, the company would have continued to employ but for the unfair labor practices, and for how long. The record indicates that ... the Board in review gave [no] consideration to whether some or all of the temporary employees eventually would have lost their jobs for acceptable business reasons. *Id.* at 602.

 The *Vancouver* court also rejected the argument made by the Board here, that the exact terms of the reinstatement order are properly left for subsequent determination, and do not affect the order's enforceability. *Id.* at 603. It noted that the order required the reinstatement, not just of some non-shareholders, but of exactly seventy-two discharged workers, and this precision made it clear that no further proceedings were contemplated regarding the number of employees to be reinstated. Because the order was so specific, it denied "the company an opportunity to show that fewer than 72 jobs would have been available regardless of its unfair practices." *Id.* Therefore, the remedial order of reinstatement was unenforceable.[15] Similarly here, the order requires that Kallmann hire all forty former employees without providing him with the opportunity to show that fewer than forty jobs would have been available. The *Vancouver* decision compels the conclusion that the Board's order regarding reinstatement is unenforceable[16] and a remand is necessary.

## E. THE BOARD'S BACK PAY ORDER

 Kallmann also contends that the order mandating back pay is unenforceable because it requires Kallmann to pay more than he would have paid the former employees. After the takeover, Kallmann established wages and benefits which were less than the former union wages and benefits. The Board ordered Kallmann to pay back wages and benefits at the rate existing immediately before the takeover, after finding that Kallmann violated section 8(a)(5) of the Act by unilaterally reducing rates of pay and benefits provided in the collective bargaining agreement. 29 U.S.C. § 158(a)(5). A back pay award is appropriate where a successor refuses to hire former employees because of anti-union animus.[17] The only question is whether the award at the higher union rate is a penalty.

 The Board recognized that, under *N.L.R.B. v. Burns Security Services,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), a successor employer is ordinarily free to set initial hiring terms without preliminary bargaining with the incumbent union. Where, however, "it is perfectly clear that the new employer plans to retain all of the employees," *id.* at 294–95, 92 S.Ct. at 1585–1586, the successor must consult with the union before altering the terms and conditions of employment. *N.L.R.B. v. Edjo, Inc.,* 631 F.2d 604, 607 (9th Cir. 1980). The Board found that this exception applied because any uncertainty regarding whether

---

**15.** *See also Florsheim Shoe Store Co. v. N.L.R.B.,* 565 F.2d 1240, 1247 (2d Cir. 1977) (where jobs affected by illegal activities would have been phased out regardless of the activities, Board must tailor its remedy to reflect the situation). *But cf. Packing House and Indus. Services v. N.L.R.B.,* 590 F.2d 688, 697 (8th Cir. 1978) (where substantial evidence supported the Board's finding that successor refused to hire any former employees because of anti-union animus, the court affirmed the Board's order requiring successor to offer employment to all 83 former employees). The successor made no contention, however, that it intended to reduce the work force. The concurring opinion noted that the Board stated that at the compliance hearing it would determine whether the employees were not rehired "*because of legitimate considerations* [such] *as a reduction in*

force ...." *Id.* at 700 (Ross, J., concurring) (quoting the Board).

**16.** The Board asserts that *Vancouver* is distinguishable because in the instant case no evidence in the record suggests the company "would not, at least initially, have retained all 40 former employees." The Board found, however, that Kallmann initially hired "approximately 30 employees." Excerpt of Record 97. *See also* Excerpt of Record 27; III Reporter's Transcript at 724, 731.

**17.** *Packing House and Indus. Services, Inc. v. N.L.R.B.,* 590 F.2d 688, 697–98 (8th Cir. 1978). *See K. B. & J. Young's Super Markets, Inc. v. N.L.R.B.,* 377 F.2d 463 (9th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 71, 19 L.Ed.2d 105 (1967).

substantially all [18] the former employees would have been retained had to be resolved against Kallmann because he could not benefit from his unlawful conduct. As we have noted, when a successor employer has discriminated in hiring, the appropriate remedy is to offer reinstatement to all the former employees. With such reinstatement ordered, it can be presumed that substantially all the former employees would be retained. We also agree with the Board that the employer should not be permitted to benefit from his illegal conduct. Consequently, we hold that Kallmann violated the Act when he unilaterally reduced wages.

Nevertheless, we disagree with the extent of the remedial order. Even though under the facts of this case Kallmann had a duty to consult with the union before unilaterally changing the terms of employment, as a successor employer he had no obligation to accept his predecessor's labor agreement. *Edjo*, at 606–07. The effect of the Board's order is to force Kallmann to abide by the terms of his predecessor's contract with the employees for the entire period of time Kallmann has owned the enterprise. In *N.L.R.B. v. Dent*, 534 F.2d 844, 846–47 (9th Cir. 1976), this court considered a similar remedial order. The successor employer in *Dent* retained all the former employees, but violated the Act by unilaterally reducing wages. The Board ordered back pay at the pre-reduction levels for all hours worked since the reduction. This court refused to enforce the order because enforcement would, in effect, cause the successor employer to be bound by its predecessor's collective bargaining agreement for the three and one-half years that the successor owned the company, a period longer than the contract period in the union's agreement with the predecessor. We also believe that to the extent that a back pay order requires payment at the higher rate

for the entire period of ownership, it acts as a penalty.

The function of the remedy in unfair labor cases is to restore the situation, as nearly as possible, to that which would have occurred but for the violation. *Phelps Dodge Corp. v. N.L.R.B.*, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941). We recognize the difficulty in reconstructing the situation in the present case. For guidance, we believe that an appropriate back pay remedy cannot require Kallmann to pay the higher rate beyond a period allowing for a reasonable time of bargaining. The facts demonstrate that Kallmann would not have agreed to union demands to pay the higher rate. Kallmann's refusal would not be unlawful. In all probability it would have led to an impasse allowing Kallmann to reduce wages. *See N.L.R.B. v. Acme Wire Works, Inc.*, 582 F.2d 153, 156–57 (2d Cir. 1978). After a reasonable period for bargaining, Kallmann would be required to pay only at the rate he set.[19]

We remand this case to the Board to determine the appropriate rate of pay and the number of employees that are entitled to reinstatement. In the Board's discretion, resolution of these issues may be left to bargaining between the parties. We order that the Board's order be enforced in part and denied in part.

**18.** The Board has construed the Supreme Court's term "all" to mean "all or substantially all." *Int'l Ass'n of Machinists, Etc. v. N.L.R.B.*, 595 F.2d 664, 671 n.35 (D.C.Cir.1978), *cert. denied*, 439 U.S. 1070, 99 S.Ct. 839, 59 L.Ed.2d 36 (1979).

**19.** *See* dissent of Judge Bryan in *Overnite Transportation Co. v. N.L.R.B.*, 372 F.2d 765, 770–71 (4th Cir.), *cert. denied*, 389 U.S. 838, 88 S.Ct. 59, 19 L.Ed.2d 101 (1967).