868 F.2d 881
 130 L.R.R.M. (BNA) 2761, 57 USLW 2551,
111 Lab.Cas. P 11,079,
111 Lab.Cas. P 11,136
 KESSEL FOOD MARKETS, INC., and Kessel Food Stores, Inc.,
(87-6362/88-5127), Petitioners, Cross-Respondents,
Local 876, United Food and Commercial Workers International
Union, AFL-CIO, CLC, (87-6365), Meat Cutters Local 539,
United Food and Commercial Workers International Union,
AFL-CIO, CLC (88-5043), Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.
 Nos. 87-6362, 87-6365, 88-5043 and 88-5127.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 13, 1988.
Decided March 1, 1989.
Rehearing and Rehearing En Banc Denied April 18, 1989.
 
 Joseph F. Martin (argued), Louis C. Rabaut, Warner, Norcross & Judd, Robert J. Chovanec, Grand Rapids, Mich., for Kessel Food Markets, Inc. and Kessel Food Stores, Inc.
 Theodore Sachs, Mary Ellen Gurewitz, Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldman, Detroit, Mich., for Local 876, United Food & Commercial Workers Intern. Union, AFL-CIO, CLC.
 Roger J. McClow, Steven M. Wolock, Klimist, McKnight, Sale & McClow, P.C., Southfield, Mich., for Meat Cutters Local 539, United Food and Commercial Workers Intern. Union, AFL-CIO, CLC.
 Paul Spielberg, Patrick Szymanski, Aileen A. Armstrong, Joseph Bornong (argued), Deputy Associate General Counsel, N.L.R.B., Washington, D.C., for N.L.R.B.
 Before MERRITT, MARTIN and JONES, Circuit Judges.
 MERRITT, Circuit Judge.
 
 
 1
 These labor cases, consolidated for hearing before an NLRB administrative law judge, before the Board, and on appeal, arise from the staffing of eight ex-Kroger grocery stores in Saginaw, Corunna and Flint, Michigan, purchased by petitioners Kessel Food Markets, Inc. and Kessel Food Stores, Inc. (collectively, "Stores"). The Stores and both Local 876, United Food and Commercial Workers and Meat Cutters Local 539, United Food and Commercial Workers, (collectively, "Unions") petition to vacate portions of the order of the National Labor Relations Board. The Stores also urge that the Board's role under Sec. 10(j) of the Act, 29 U.S.C. Sec. 160(j)[1], in seeking an injunction against them and its subsequent adjudication of charges against them violate their due process right to a hearing before an impartial arbiter. The NLRB cross-petitions for enforcement. Because we believe that the Board's findings are reasonable and supported by substantial evidence and that the Sec. 10(j) process does not violate the Stores' right to due process, we enforce the order of the Board.
 
 
 2
 Three cases are before us on appeal. In the first, the Union charged and the resulting NLRB complaint alleged that Kessel, in its hiring process for the Saginaw and Corunna stores, unlawfully refused to hire former Kroger employees to avoid successor status and a corresponding duty to recognize and bargain with the Unions. The Board also petitioned the District Court, pursuant to Sec. 10(j) of the Act, 29 U.S.C. Sec. 160(j), for an injunction, pending final disposition of the charges, enjoining Kessel from engaging in the challenged conduct.
 
 
 3
 In the second case and before a decision issued in the first, the Unions charged and the resulting complaint alleged that Kessel unlawfully discharged two employees, Huffman and Wallen, who gave adverse testimony at the hearing on the first charge. In the third case and still before a decision issued in the first, the Unions charged and the resulting complaint alleged discriminatory hiring by Kessel at its Flint stores. By motion of the General Counsel, the record in the first case was reopened and the three complaints were consolidated. A hearing before ALJ Kaplan on the consolidated case followed.
 
 
 4
 At the hearing, the ALJ heard sharply conflicting testimony from approximately 65 witnesses. The ALJ found that Kessel had violated Secs. 8(a)(1) and (3)[2] by its hiring practices at Saginaw and Corunna but did not do so at Flint, and that Kessel did not violate Sec. 8(a)(5)[3] by refusing to bargain with the Unions. All parties filed exceptions. The Board substantially affirmed the ALJ but found additional Sec. 8(a)(1) violations in Kessel's coercive interrogation of applicants and in its non-union statements; and on other grounds, affirmed the dismissal of the Sec. 8(a)(5) allegations at all the stores and the Sec. 8(a)(1) allegations concerning the Flint stores. The Board, therefore, ordered Kessel to cease and desist from engaging in the unfair labor practices, reinstate the two discharged employees, offer employment to all applicants who were victims of discrimination, pay back wages where appropriate and post a remedies notice.
 
 
 5
 Kessel now appeals the Board's finding (1) that its hiring process at Saginaw and Corunna violated Secs. 8(a)(1) and (3) of the Act, 29 U.S.C. Secs. 158(a)(1) and (3); and (2) challenges, as a violation of its due process right to an impartial arbiter, the Board's power to both pursue an injunction against the Stores and adjudicate the charges against them. The Unions appeal the Board's findings (1) that Kessel's hiring process at the Flint stores did not violate the Act, (2) that ex-Kroger employees who did not apply for positions at the Stores were not entitled to relief, and (3) that Kessel is not automatically deemed a successor to Kroger and required to recognize and bargain with the Unions.
 
 I.
 
 6
 At the hearing the ALJ heard testimony of approximately 65 witnesses with sharply conflicting versions of the events. The ALJ had the opportunity to observe the demeanor of the witnesses and assess their credibility. The ALJ rendered a detailed opinion specifically resolving the conflicts in the testimony and setting forth a reasoned basis for crediting the testimony of some witnesses over that of others. The following facts, as found by the ALJ, are supported by substantial evidence and form a legitimate basis for the ALJ's conclusions.
 
 A. Hiring at Saginaw and Corunna Stores
 
 7
 During the summer of 1981, Kroger offered for sale a package of 13 stores in eastern Michigan. Kroger formally announced the closing of three of those stores, two in Saginaw (located on Bay Road and State Street) and one in Corunna, in October. In early November, Albert Kessel decided to buy the three Saginaw-Corunna stores.
 
 
 8
 Kessel offered Sam Morris, a former associate of Kessel, a partnership in the prospective business. Morris declined the partnership but promised to help get the business started. Kessel asked Morris to start by finding prospects for the store manager positions.
 
 
 9
 On November 13, Morris contacted Richard Huffman, who formerly worked with Morris, and offered him the managership of a store. Morris told Huffman that the stores would be family-owned and nonunion.
 
 
 10
 Kessel and Morris met again on November 14. Kessel drove Morris around to view the three stores and described his plans in greater detail. Kessel said he planned to open the "Burger King" of grocery stores, with an emphasis on low prices and fast service. Kessel planned to hire a small core of experienced employees for full time work, and a much larger complement of part-time employees, who would work at a lower wage rate. Kessel also informed Morris that he intended to operate the stores without a union.
 
 
 11
 Kessel went to Cincinnati, Ohio, on November 16 to conclude his purchase. Kessel left Morris local newspaper advertisements about managerial openings for Morris to place. On November 18, Kessel consummated his purchase and the ads first appeared in the local papers that day.
 
 
 12
 On November 19, Huffman accepted Morris' offer to manage the store in Corunna. That same day, at the Bay Valley Inn, Morris began taking applications and interviewing applicants for managerial positions. Morris asked one applicant with Kroger experience how she felt about unions and about Kroger, and he told her that his stores would be nonunion. Morris asked another applicant if she would mind working for a nonunion store. On November 23, the interviews moved to a Holiday Inn next to Kessel's State Street store in Saginaw.
 
 
 13
 On November 25, Kessel placed a new ad for rank and file positions. The new ads identified Kessel and his stores' locations and scheduled interviews for November 27 and 28 at the Bay Road Store in Saginaw.
 
 
 14
 Morris met with Huffman over breakfast on November 27 to train Huffman in the interviewing process. Morris directed Huffman to hire less than a majority of former Kroger personnel in order to avoid having to bargain with the Unions. The rest of the day, Morris conducted interviews while Huffman sat in and made recommendations on the applicants. Morris asked former Kroger employees how they felt about the Unions and whether they thought Kroger might have survived had the Unions granted concessions.
 
 
 15
 That evening, Kessel told the group of supervisory staff to be careful about how many former Kroger employees they hired and that the number of former Kroger employees they hired should not approach 50 percent of the total workforce. Kessel said, "No way in hell [do I] want the fucking Union to have penetration into the stores, because if Kroger could not have survived in that area with Union representation, there's no way Kessel stores could."
 
 
 16
 Later that night, Kessel told Huffman that hiring so far had been directed to staffing the two Saginaw stores, but that the focus would soon shift to Huffman's Corunna store. Kessel again cautioned Huffman to observe the 50 percent ceiling on hiring employees with Kroger experience and to refuse employment to any member of the Meat Cutters Union.
 
 
 17
 Initially, Morris conducted the interviews, with Huffman present. Morris asked questions about the applicants' feelings about unions and about Kroger's demise. Huffman routinely informed applicants that the stores would be nonunion and asked former Kroger employees about their feelings toward unions and their opinions on the cause of Kroger's closing. Huffman informed two people who had applied earlier in the process, Gail Zedemont and Ricky Wisner, that he could not hire them because Kessel had a quota for the hiring of former Kroger employees.
 
 
 18
 On December 7, Kessel told Huffman to lower the percentage of former Kroger employees from 50 percent to 33 percent. In the presence of Brad Wallen, Huffman's meat department manager, Kessel also reminded Huffman that they would not hire any members of the Meat Cutters Union despite Wallen's complaints about the inexperience of the meat department employees hired so far.
 
 
 19
 In late November or early December, former Kroger employee Bonnie Flathau, who had earlier applied at the Bay Valley Inn, called the store and talked to Mary Meacham, head cashier at the State Street store in Saginaw. Meacham told Flathau not to be too disappointed if she did not receive an offer because Kessel could "only ... take a certain percentage of Kroger people, otherwise he'd be in trouble with the Union."
 
 
 20
 Former Kroger employee Jerry McLaren called to speak with Denise Henke, front end supervisor. Henke, a former Kroger employee, herself, had helped McLaren and some other former Kroger employees go to the front of the line during the Bay Road store's application process. When this group got into the store, Larry Schmidt, manager of the Bay Road store, took down their names on a sheet of paper and told them they did not have to fill out formal applications because they were "as good as hired." Having heard nothing from Schmidt thereafter, McLaren called the store and talked to Henke, who said she was "[s]orry, but we filled our quota of the old Kroger employees."
 
 
 21
 The two Saginaw stores opened on December 2. The Corunna store opened on December 9. The three stores operated as Kessel Food Markets, Inc. Under Kroger, the three stores had about 174 employees. Under Kessel, the stores had about 239 employees, including 23 supervisors, 16 meat department employees, and 200 employees in the remaining rank-and-file jobs. Seventy-two of the 174 ex-Kroger employees applied for jobs in the Saginaw and Corunna stores. The Company hired 12 as supervisors, none for the meat department, and 22 for the remaining jobs.
 
 
 22
 The ALJ made these findings of fact. They are supported by substantial evidence and constitute unfair labor practices as the Board found.
 
 B. Hiring at Flint Stores
 
 23
 Kessel purchased five additional ex-Kroger stores located in Flint, Michigan on April 30, 1982, and hired management personnel for those stores during the first week of May. Four of the five persons hired as managers for the Flint stores had previously managed the same stores for Kroger. Roy Brody was hired as director of store operations overseeing all eight stores. At a meeting in Saginaw on May 7, Kessel told his managers that he would prefer to operate the stores without a union, and that it would be the managers' job "to create an atmosphere" in which employees would not feel the need to have a third party represent them.
 
 
 24
 Ads for rank-and-file employees appeared in the papers on May 11. Kessel segregated the applications of former Kroger employees from those of other applicants. On May 16, Kessel, Brody, and the five store managers met to evaluate these applications. Kessel explained that, contrary to certain rumors and newspaper articles, he had no limit on the number of former Kroger employees who could be hired. The four ex-Kroger managers rated each ex-Kroger applicant as poor, average, good, or excellent, based on their personal knowledge. Kessel insisted on substantiation for any poor or average evaluation. All Kroger applicants who were rated good or excellent, as well as those whom none of the managers remembered, received offers of employment. All other applicants were evaluated based on interviews and a test of their cash register skills.
 
 
 25
 Kessel hired Patrick Haley, a member of the Meat Cutters Union, in early May as meat manager for all five Flint stores. Kessel asked Haley to do what he could to recruit experienced meat cutters. Haley discovered that few experienced meat cutters were looking for work.
 
 
 26
 On May 23, the five Flint stores opened for business as Kessel Food Stores, Inc. Under Kroger, the Flint stores had 323 employees. Under Kessel, the stores had 432 employees, including 37 supervisors, 41 meat department employees, and 354 employees in the remaining rank-and-file jobs. Of 124 ex-Kroger employees who sought work in the Flint stores, the Company hired 24 as supervisors, 1 for the meat department, and 59 for non-meat jobs.
 
 C. Retaliation
 
 27
 On September 20, 1982, the ALJ held a hearing on charges that Kessel's hiring practices in Saginaw and Corunna violated the Act. On September 21, Huffman testified, for the most part adversely to Kessel's interests. Wallen was scheduled to testify on behalf of the General Counsel later in the week.
 
 
 28
 That evening, Kessel called a staff meeting at the Corunna store for all supervisory personnel except Huffman and Wallen and announced that Huffman had testified with "inaccurate recall." Kessel said that he had previously trusted his management personnel, but that now he did not know what to think. He invited those present to tell him anything they might know about Huffman or about Wallen. Kessel told the group that Huffman was no longer to have access to the store office, telephone, or any confidential materials.
 
 
 29
 Huffman reported to work as usual on September 22. Brody and others met Huffman and explained the restrictions Kessel had just imposed. Brody told Huffman he was not to discuss the case with anyone and asked for Huffman's keys to the office. Brody also explained that his brother, Al, had been brought in to help manage the store and that Huffman was restricted to dealing with personnel and customers on the sales floor.
 
 
 30
 Huffman noticed that Al Brody appeared to be following him around that day. When confronted, Al Brody apologized and explained that he was only following orders.
 
 
 31
 Brad Wallen testified on September 23. After the hearing that day, Huffman and Wallen went to the Corunna store together to check their schedule and to buy some beer. Kessel met them at the check-out counter and informed them that they were suspended with pay and that they should call in daily to check on their status.
 
 
 32
 Between September 22 and mid-October, various Corunna employees told Kessel about numerous incidents of deception and disloyalty allegedly committed by Huffman and Wallen over the previous six months. In addition, employees Richard Haney and Gary Rubelman reported that Wallen had told them that the Unions had offered both him and Huffman $20,000 for their testimony. Kessel never asked Huffman or Wallen about any of the employees' allegations or made any other investigation. On October 16, Huffman and Wallen received identical letters notifying them that they had been discharged for "repeated acts of disloyalty."
 
 
 33
 Evidence of these facts sustain the findings and conclusions of the ALJ and the Board respecting Kessel's conduct. The evidence also sustains the conclusion that no unfair labor practices occurred at the Flint stores.
 
 II.
 
 34
 Kessel next challenges, as a violation of due process, the statutory scheme by which the Board may first pursue an injunction against any employer to restrain further activity in violation of the Act and then decide, through the hearing process, whether the employer has violated the Act. Specifically, Kessel argues that such activity impermissibly combines both prosecutorial and adjudicatory functions in a select group of board members and allows the Board to act as prosecutor, judge and jury. In support of its position, Kessel cites the NLRB Case Handling Manual Sec. 10310.1 which requires that the regional director submit a memorandum to the Board which "argues" that the Act has been violated, "argues" in favor of Sec. 10(j) relief and requests permission to pursue such Sec. 10(j) relief. Kessel also cites several cases which stand for the proposition that the person who investigated the underlying facts should not participate in making the resulting adjudicative decision. See Amos Treat & Co. v. SEC, 306 F.2d 260 (D.C.Cir.1962); King v. Caesar Rodney School District, 380 F.Supp. 1112 (D.Del.1974). Finally, Kessel attempts to distinguish the few contrary decisions upholding Sec. 10(j) procedures as erroneous and not well reasoned. See NLRB v. Sanford Home for Adults, 669 F.2d 35 (2d Cir.1981); Eisenberg v. Holland Rantos Co., 234 NLRB 726, aff'd, 583 F.2d 100, 104 n. 8 (3d Cir.1978).
 
 
 35
 This issue is a matter of first impression in this circuit. Two other circuits have reached the issue. In Holland Rantos, supra, the Third Circuit stated that upon review of the record, it could find no improper combination of functions of the Board in view of Congress' broad discretion in distributing and combining functions in its administrative agencies. 583 F.2d at n. 8. In NLRB v. Sanford Home for Adults, supra, the Second Circuit also declined to invalidate the Sec. 10(j) process.
 
 
 36
 The Supreme Court reached the general issue of the power of administrative bodies in such instances in Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). In Withrow, a physician challenged, as a violation of due process, a state statute which allowed an examining board, composed of fellow doctors, both to suspend temporarily the doctor's license at its own contested hearing on charges arising from its earlier investigation. The due process claim was based on the doctor's contention that the Board acted as both advocate and judge. In upholding the constitutionality of the state procedure, the Court held that the combination of investigative and adjudicative functions does not, without more, constitute a violation of due process. Id. at 46-54, 95 S.Ct. at 1464-68. The Court held that the fact that the examining board "proceeded to make and issue formal findings of fact and conclusions of law asserting that there was probable cause to believe" that the physician had violated state law did not show "prejudice and prejudgment." Id. at 55-56, 95 S.Ct. at 1468-69. The Court reasoned:
 
 
 37
 Judges repeatedly issue arrest warrants on the basis that there is probable cause to believe that a crime has been committed and that the person named in the warrant has committed it. Judges also preside at preliminary hearings where they must decide whether the evidence is sufficient to hold a defendant for trial. Neither of these pretrial involvements has been thought to raise any constitutional barrier against the judge's presiding over the criminal trial and, if the trial is without a jury, against making the necessary determination of guilt or innocence. Nor has it been thought that a judge is disqualified from presiding over injunction proceedings because he has initially assessed the facts in issuing or denying a temporary restraining order or a preliminary injunction. It is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law.... We should also remember that it is not contrary to due process to allow judges and administrators who have had their initial decisions reversed on appeal to confront and decide the same questions a second time around....
 
 
 38
 Here, the Board stayed within the accepted bounds of due process. Having investigated, it issued findings and conclusions asserting the commission of certain acts and ultimately concluding that there was probable cause to believe that appellee had violated the statutes.
 
 
 39
 The risk of bias or prejudgment in this sequence of functions has not been considered to be intolerably high or to raise a sufficiently great possibility that the adjudicators would be so psychologically wedded to their complaints that they would consciously or unconsciously avoid the appearance of having erred or changed position. Indeed, just as there is no logical inconsistency between a finding of probable cause and an acquittal in a criminal proceeding, there is no incompatibility between the agency filing a complaint based on probable cause and a subsequent decision, when all the evidence is in, that there has been no violation of the statute. Here, if the Board now proceeded after an adversary hearing to determine that appellee's license to practice should not be temporarily suspended, it would not implicitly be admitting error in its prior finding of probable cause. Its position most probably would merely reflect the benefit of a more complete view of the evidence afforded by an adversary hearing.
 
 
 40
 The initial charge or determination of probable cause and the ultimate adjudication have different bases and purposes. The fact that the same agency makes them in tandem and that they relate to the same issues does not result in a procedural due process violation.
 
 
 41
 Id. at 56-58, 95 S.Ct. at 1469-1470. (emphasis added) (footnotes omitted) (citations omitted).
 
 
 42
 Withrow is dispositive of Kessel's due process argument. Kessel argues no special facts or circumstances which make the risk of unfairness intolerably high. We, therefore, reject Kessel's argument that the Sec. 10(j) process is unconstitutional.
 
 III.
 
 43
 The Unions argue that the ALJ improperly excluded evidence that ex-Kroger employees did not apply to Kessel because they believed it futile. The Unions argue that in excluding the evidence, the ALJ promised that he would infer futility and, accordingly, Kessel's successor status, from evidence that Kessel engaged in discriminatory hiring practices in violation of Sec. 8(a)(1).
 
 
 44
 A careful review of the record, however, reveals that the ALJ made no such promise. Such offers of proof were made in two instances--through the testimony of Adams and through that of Dickerson. The proffered Adams testimony was that Adams did not apply for a position with Kessel because certain Kessel employees informed him that the store would be nonunion. See Hearing Transcript at 446. The ALJ allowed this testimony with the caveat that Kessel would be given the opportunity to renew his objection to admission and make a motion to strike the testimony in his brief. Id. at 453.
 
 
 45
 The Dickerson testimony was that a Kessel employee told Dickerson that the Stores would hire only a certain percentage of ex-Kroger employees. The ALJ excluded this proffered testimony because the alleged statement was made to Dickerson after he had applied for a position with Kessel. Id. at 492. The ALJ also stated that such testimony was unnecessary because if he found that Kessel made Sec. 8(a)(1) statements to a number of employees, he could (not would ) infer futility. Id. at 490.
 
 
 46
 It is clear, therefore, that the ALJ did not make the promise the Unions' claim. Moreover, the Unions' argument that the ALJ and the Board are bound by Kallman, d/b/a Love's Barbeque v. NLRB, 640 F.2d 1094 (9th Cir.1981), to make such an inference is without merit. In Kallman, the Board presumed that nonapplicants were discriminatees because the employer structured its hiring process to prevent the former employees from applying. This presumption is not mandatory and is not appropriate in this case because here there was no concealment of the application process (Kessel's first blind ad was legitimate because it was placed before Kessel had completed the purchase and was for supervisory, not bargaining unit employees), Kessel's operating plan required a larger number of employees with significantly more of them hired on a part-time basis than did Kroger's and many of the ex-Kroger employees transferred to other Kroger stores and were not looking for work.
 
 
 47
 Finally, the Unions challenge the Board's finding that Kessel is not automatically deemed a successor to Kroger and required to recognize and bargain with the Unions. Specifically, the Unions argue that once a discriminatory scheme has been demonstrated, the Board was required to find that but for the discrimination, Kessel would have retained all the former Kroger employees and that, therefore, Kessel was a successor to Kroger and must recognize and bargain with the Unions.
 
 
 48
 A new employer, however, is deemed, for collective bargaining purposes, a successor, only when "there is substantial continuity of the business enterprise." NLRB v. Burns Int'l Sec. Services, Inc., 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). To establish continuity of the business enterprise, a charging party must show, inter alia, continuity of the work force, i.e., that a majority of the employees of the new enterprise were employees of the predecessor enterprise. Id. at 296-97, 92 S.Ct. at 1586-87. The Unions, however, are unable to demonstrate such continuity. As the Board correctly concluded, if Kessel had hired all the ex-Kroger employees who applied for positions and who were given information by Huffman, neither Kessel's meat nor non-meat units would have contained a majority of ex-Kroger employees. Moreover, as the Board correctly concluded, ex-Kroger applicants who did not apply were not victims of discrimination, as discussed above. They, therefore, could not be considered in making the majority status determination.
 
 
 49
 In addition, other facts establish that regardless of Kessel's unlawful considerations, Kessel would not have hired Kroger's entire work force. Kessel's store operated with a larger work force composed of more part-time employees than Kroger. Kessel's different operating methods were based on a lawful and legitimate business reason--the desire to have an operation which provided rapid and enhanced customer service. Moreover, many of the former Kroger employees were not available since many transferred to other Kroger stores upon the closing of the Flint, Saginaw and Corunna stores. The Board, therefore, properly refused to impose successor status and the resulting bargaining obligation on Kessel.
 
 
 50
 For the foregoing reasons, the Board's order is enforced.
 
 
 
 [1]
 (j) The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order
 
 
 [2]
 (a) It shall be an unfair labor practice for an employer--
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 * * *
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization....
 
 
 [3]
 (a) It shall be an unfair labor practice for an employer--
 (5) to refuse to bargain collectively with the representatives of his employees subject to the provisions of section 159(a) of this title;