**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SHERWOOD TRUCKING COMPANY, Respondent.**

Nos. 84–5627, 84–5653.

United States Court of Appeals, Sixth Circuit.

Argued July 9, 1985.

Decided Oct. 28, 1985.

Elliott Moore, Ellen Boardman, Deputy Associate Gen. Counsel, N.L.R.B. Washington, D.C., for N.L.R.B.

John N. Childs, Buckingham, Doolittle & Burrough Co., James D. Kurek, Akron, Ohio, for Sherwood Trucking Co.

Before MARTIN, CONTIE and WELL- FORD, Circuit Judges.

PER CURIAM.

This is an application by the National Labor Relations Board ("NLRB" or "Board") for enforcement of its order requiring Sherwood Trucking Company ("Sherwood"), *inter alia*, to offer twelve truckers immediate employment plus back pay, recognize and bargain with the Teamsters Local Union (the "Union") as the exclusive bargaining representative of all employees in the appropriate unit, and post notice of its alleged wrongdoings. The Board accepted without modification the ALJ's recommended decision. Because we do not find substantial evidence supporting its findings, we *DENY* enforcement of the Board's order.

## I. BACKGROUND

Emery Air Freight Corporation ("Emery") engages in the air freight business at a facility located at the Dayton airport in Vandalia, Ohio.[1] Emery contracts its local pick-up and delivery service to drayage companies which use trucks with Emery markings. For a period ending on October 24, 1980, Emery's drayage contractor for the Dayton airport was Foreman Express, Inc. ("Foreman"). Sherwood, which replaced Foreman as Emery's drayage subcontractor on October 24, was not related to Foreman. Sherwood was incorporated in 1978, long before Emery's problems with Foreman, Mr. Blodgett, Sherwood's sole owner, did not have any financial interest in Foreman; Sherwood used completely different (and new) equipment; it "leased" its drayage employees from a personnel agency rather than hiring them itself, and paid these drivers a percentage of revenues as their sole compensation rather than paying them on salary.

In mid-1977, Foreman and the Union signed a three-year collective bargaining agreement covering Foreman's drivers and combination driver-dockman at the Dayton terminal. The contract contained a union security clause requiring union membership. On June 27, 1980, Foreman and the Union signed a contract addendum increasing the drivers' wages in June, August and September, their health insurance effective August 1, 1980, and extending the contract through March, 1981.

During July 1980, Emery began to investigate obtaining a replacement drayage contractor because there were indications that Foreman was having financial problems, its equipment was in "poor repair," and there were morale and productivity[2] problems among its work force. In late July 1980, Jim Irwin, Sherwood's president, spoke with Gary O'Dell, Emery's local service manager, about submitting a proposal for the drayage work, but he indicated that there was no real press for time about it. Sherwood did not begin drafting the proposal until early October when O'Dell asked where the proposal was. At least two other drayage subcontractors submitted proposals to Emery in October and November; O'Dell, *Emery's* manager, said he wanted a "clean sweep: new trucks, new drivers."[3]

---

1. The Union originally filed charges against Sherwood and also against Emery. The Union withdrew the charges against Emery, however; only Sherwood was included in the Board's complaint.

2. The record supports the claim of productivity problems: under Foreman the drivers were averaging 1.75 stops per hour, whereas Sherwood labeled 5 stops per hour only "satisfactory" and actually expected better performance than that.

3. Gary O'Dell was the only disinterested witness heard by the ALJ. The ALJ wholly discredited O'Dell's testimony while fully crediting the interested terminated employees' testimony. While we accord great deference to an ALJ's credibility determinations, the ALJ must have some reasonable bases upon which he acts to decide the facts. Particularly when the testimony of a disinterested witness contradicts the uncorroborated testimony of those who would be the beneficiary of reinstatement and backpay, this court will look carefully at what may be a capricious credibility determination. *See NLRB v. Norbar*, 752 F.2d 235 (6th Cir.1985);

On October 17, Sherwood submitted a written bid to Emery. With respect to Emery's requirement that it employ a new driver work force, Sherwood proposed using drivers from a personnel leasing service and paying them on a commission basis as their sole compensation. One week later, on Friday, October 24, Foreman asked Emery for a ten per cent rate increase to cover its additional labor costs, but Emery refused. Foreman informed O'Dell that it would discontinue service and go out of business at the end of the day.

At about 2:00 p.m. on that same day, O'Dell telephoned Blodgett in Indianapolis, Indiana, and asked him to have Sherwood begin service on an interim basis at 8:00 a.m. on Monday, October 27, using ten new trucks and ten new drivers but retaining Joe Phillips, a Foreman supervisor and dispatcher. Blodgett then called Sherwood's president, Irwin, stationed in Akron, Ohio, and asked him to line up the trucks and contact personnel agencies for drivers. The specification for "new drivers" came from Emery.

Late that afternoon, Blodgett and Irwin met at Emery's airport terminal with O'Dell and his boss, Mike Gunkel, to discuss the details of the new operation. They discussed economics and Emery's desire that Foreman's employee, Phillips, be hired by Sherwood but that all of the drivers be replaced, and these specifications were agreeable to Sherwood.

Immediately after this meeting, at about 6:00 p.m., Blodgett met with Phillips and hired him "on a temporary basis." There is considerable controversy concerning the position in and status with which Sherwood employed Phillips. In particular, the Board found that he was a supervisor, whereas Sherwood claims he was merely a dispatcher. Upon careful examination of the record, we find that substantial evidence does not support the Board's finding that Phillips was a supervisor at the relevant time when Sherwood became the new contractor and hired its initial employees.

At the Board's hearing, Phillips was asked "what *were* your responsibilities with Foreman?", to which he responded "[b]asically the same I have with Sherwood" (emphasis added). Phillips had been a supervisor at Foreman. In describing the differences between his authority at Foreman and at Sherwood he noted: (1) At Sherwood he is more of a manager because he gets "to look at the books and know[s] the money end of the operation", and (2) at Foreman he had the authority to hire employees, *but at Sherwood he did not.*

According to Blodgett, who interviewed and hired Phillips for Sherwood, Phillips had nothing to do with the selection of drivers although he did administer Department of Transportation ("DOT") tests to the new drivers. Blodgett stated that Phillips was to "run the day to day operations," but with Blodgett's directions concerning the way he wanted it dispatched and the equipment and drivers he wanted used.

Jim Irwin, Sherwood's president, who was present to oversee the Sherwood operation, was asked whether he had ever reversed Phillips' recommendations regarding discipline. Irwin responded "Oh, yes. Yeah, many times. *Joe does not really have that responsibility.* Joe basically takes care of our day-to-day operation" (emphasis added). Irwin then related an instance of his overruling Phillips about a replacement driver.

One of the complaining parties, Terry Hutton, testified that the Sunday after Sherwood had hired Phillips, Phillips described his new position as that of a dispatcher. Lawrence Coomer, another complaining witness, during the Board's investigation of the claim stated: "He [Phillips] could pick and choose the people [the personnel firm] sent him. I've heard this from other people." During the hearing, however, Coomer claimed that he learned that Phillips had this authority from Phillips himself. Coomer's testimony was inconsistent and Phillips' testimony was not compatible with that of Coomer.

The ALJ concluded, nevertheless:

*Delco Air Conditioning Division v. NLRB,* 649 F.2d 390, 393 (6th Cir.1981).

On Sunday, October 26, 11 driver candidates were sent by [the personnel agency] to Sherwood for road testing by Phillips. Those approved[4] by Phillips were hired. Two or three were rejected by Phillips and were not hired. Phillips agreed that beginning Monday, October 27, he alone directed operations for Sherwood [and] he possessed discharge authority. I find that from the time of his hiring ... Phillips was a supervisor.

We find insufficient support in the record for these conclusions as to Phillips' alleged supervisory status on October 26 when new drivers were hired.

Phillips informed the drivers when they returned from their routes on October 24 that Foreman was out of business and they were unemployed. Lawrence Coomer, the Union steward, was the first driver to return. When Coomer arrived at the terminal at about 4:45 p.m., Phillips told him that Foreman was out of business. Coomer telephoned the Union's office to report the situation and was assured the drivers would soon receive their withdrawal cards.

At about 5:00 p.m., Phillips told driver Hutton that Foreman was out of business and that Hutton was to turn in his truck. Hutton indicated that he had planned to be out of town during the coming weekend. The ALJ found that Phillips told him to stop by Phillips' house on Sunday evening to find out whether he would be employed by the new drayage company, yet Hutton's testimony indicates that Phillips merely told him to stop by on Sunday because he would know more about the new company by that time.

Driver Bernard Noble came in between 5:30 and 5:45 p.m. on Friday. Phillips told him Foreman was out of business and he did not know who the new company was. Their conversation was interrupted when Phillips was called into the office to be interviewed by Blodgett. The Board found that: "When Phillips returned, Noble asked whether that [Blodgett] was a representa-

tive of the new company. Phillips said yes. Noble asked if Phillips had been hired by the new company. Phillips gave a vague response and told Noble to leave."

The last driver in on Friday night was Darrell Presley who arrived at about 7:00 or 7:15 p.m. The Board found that upon Presley's return:

Phillips told him, "We haven't got a job anymore." He said that Foreman was bankrupt and that his own plans were indefinite. Presley asked whether Phillips knew the identity of the new drayage company and whether Presley could apply to the new company. Phillips said, "No, not at this time. I really don't know."

The afternoon of October 24, Sherwood's president, Mr. Irwin, was trying to secure trucks to start operations on Monday morning. A personnel agency that he had contacted referred eleven driver candidates to be given road tests over the weekend. Phillips tested potential new drivers on Sunday, October 26. Two or three of these drivers eventually were replaced for "incompetency."

None of the twelve former Foreman drivers whom the Board ordered Sherwood to hire and who, under the Board's order, would receive backpay awards, ever applied for jobs at Sherwood or at the personnel agency from which Sherwood obtained its drivers. They claim they knew applying for jobs would be futile because of Sherwood's anti-union sentiment expressed to them by Phillips. Sherwood had hired all its new drivers during the day on Sunday, October 26. Under the facts as found by the ALJ, however, the earliest any Foreman employee would have learned of Sherwood's purported anti-union sentiment was that Sunday night—*after* Sherwood had hired all of its drivers. Coomer, one of Foreman's drivers, went on a previously planned one month vacation starting Saturday, October 25, and did not return and could not have sought employment with

---

**4.** The ALJ uses the phrase "those approved" rather than "those passing the DOT test." Clearly Phillips was in charge of giving the tests, which are required to be passed before a driver is permitted to drive the trucks.

Sherwood until November 25, well after Sherwood had hired its full complement of drivers. Yet Coomer is included in the Board's award and would receive backpay and employment at Sherwood.[5]

On Sunday night, October 26, again *after* Sherwood had hired its drivers, former Foreman driver Hutton went to Phillips' residence, as Phillips earlier had suggested. Hutton claims that Phillips stated he would be running the operation, but that the Foreman drivers would not be hired because they were union-affiliated. Even if the ALJ credited Hutton's version of this conversation rather than Phillips', the discussion took place after Sherwood's plans had been carried out to hire all new drivers on a compensation basis entirely different from Foreman's.

Sherwood began performing drayage service for Emery on Monday morning, October 27. Early that morning, Presley and former Foreman drivers Smith, Williams, and Woolsey met to discuss how to apply for jobs with Sherwood. All went to the airport to talk to Phillips, although only Presley appears to have actually talked with Phillips.

The ALJ found that when the former drivers arrived at the terminal Phillips was giving route directions to the new drivers. Presley told Phillips he wanted to submit an application to work for Sherwood and asked what his chances were of getting a job. Phillips, according to Presley, told him there was "no chance" because Sherwood did not "want anything to do with the Union, I don't think there's no use of your putting an application in," and "the drivers for Foreman Express would not be retained because of their Union affiliation."

Later the ALJ found that Phillips made similar statements to other former Foreman drivers that their union affiliation prevented their being hired by his new employer.

On January 6, 1981, former driver Noble telephoned Phillips and tape recorded their conversation. During the conversation, Noble indicated that all the drivers had been discussing the situation among themselves, trying to figure out how to become employed with Sherwood. Phillips told him that Sherwood had not hired the Foreman drivers because of their Union affiliation.

The Board accepted without modification the ALJ's decision, finding that Sherwood violated Section 8(a)(1) of the Act (29 U.S.C. § 158(a)(1)) because Phillips told the former Foreman employees that they were not hired or retained because of their Union affiliation. We accept the Board's findings that after new drivers were hired by Sherwood, Phillips expressed anti-union sentiments and gave this as a reason for not hiring Foreman drivers. The Board also held that Sherwood was the legal successor to Foreman's obligation to bargain with the Union. There is also substantial question that there is support in the record for this holding.

The Board's order requires Sherwood to cease and desist from the unfair labor practices found and from in any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed by Section 7 of the Act (29 U.S.C. § 157). Affirmatively, the order requires Sherwood to offer the twelve Foreman drivers immediate employment in the positions to which they would have been entitled had they not been discriminated against and to make them whole for any loss of earnings they may have suffered due to Sherwood's unlawful conduct; to recognize and, upon request, bargain with the Union;[6] and to post an appropriate notice.[7]

---

**5.** The ALJ described Coomer's decision to leave on vacation: "Undaunted by the events of the day he left the area, returning on November 25."

**6.** The ALJ ordered Sherwood to bargain with the Union despite its conclusion that there were

no allegations that Sherwood violated Section 8(a)(5) of the NLRA.

**7.** One Board member noted that he would not order Sherwood to reinstate all the employees if it could show at a compliance hearing that there would not have been enough jobs available for all of them in the absence of the unfair labor

## II.  SUBSTANTIAL EVIDENCE

It is apparent that the ALJ drew every inference in favor of the complainants in this controversy.  The record supports the ALJ's finding, despite Phillips' denial, that he told Foreman's former employees that Sherwood did not want anything to do with the Union.  This is not sufficient to establish the claimed § 8(a)(1) and (3), 29 U.S.C. § 158(a)(1) and (3), NLRA violations.

In the situation presented here, the evidence also must show:

(1) Phillips held a supervisory position, (not merely a dispatcher) and similarly that Phillips' statements were within the scope of his employment (*i.e.* that he had authority to hire and fire employees),

(2) the employees' failure to apply for positions with Sherwood or its personnel agency was legally excusable, and

(3) Sherwood had positions available for the Foreman employees at the time they applied, or may have applied, for positions with Sherwood but for information which would make application futile.

■ Phillips unquestionably held a supervisory position with Foreman prior to its demise.  Phillips also held a supervisory position with Sherwood by the time of the hearing.  The evidence, however, does not support the ALJ's conclusion that Phillips was a supervisor at the times it was found that he said that Sherwood wanted to avoid Union employees.

It is disputed that Phillips was hired initially as a dispatcher at *Emery's urging.*

Sherwood's testimony indicates without contradiction that this was on a temporary basis.  Phillips was in charge of administering required DOT driving tests without which the new drivers would not be permitted to drive the trucks.  It is evident that it made good business sense for Sherwood to hire Phillips as a dispatcher because he knew the area's delivery routes and quickly could organize the new drivers in Sherwood's new mode.  When, as in Phillips' case, a dispatcher acts routinely, within parameters carefully drawn by a superior, such a dispatcher is not an NLRA § 2(11) "supervisor." *B.P. Oil, Inc.*, 256 N.L.R.B. 171 (1981), *enf.*, 109 L.R.R.M. (BNA) 3296 (3d Cir.1982).[8]

The evidence supporting the Board's conclusion that Phillips was a supervisor with the authority to hire and fire employees is tenuous at best, even after the initial hiring and during the critical first few weeks of Sherwood's new operation.  The Board principally relied upon Phillips' prior role as supervisor and dispatcher with Foreman, and upon his role with Sherwood at the time of the hearing a year after Sherwood took over as Emery's drayage subcontractor, to support its conclusion that Phillips was a supervisor.  This does not constitute substantial evidence in our view during the time Sherwood scrambled to begin in accordance with Emery's directions.

It is crucial to the Board's decision that Phillips be a supervisor at the critical time at Sherwood's beginning as an Emery dray-

---

practices found, but would order that any remaining discriminatees be placed on a preferential hiring list.  The Board, however, adopted the recommended order in full.

**8.** Evidence from a completely disinterested source—one of Sherwood's competitors—indicates that Phillips was to be hired only as a dispatcher. *Emery*, through O'Dell, specified that the only Foreman employee *it wanted its* new drayage subcontractor to hire was Phillips.  PBF Enterprises, Inc. in its proposal to Emery clearly states: "All efforts will be made to utilize the current *dispatcher* who certainly would be familiar with the zones, customers, etc..... If we are not successful in hiring the current *dispatcher,* one of our company dispatchers will be on site to train a new man" (emphasis added).

*Carrier Corp. v. NLRB*, 768 F.2d 778 (1985), a decision in which we held that a dispatcher could be a "supervisor" within the meaning of § 2(11) of the NLRA, is distinguishable from the instant case.  In *Carrier*, the dispatcher "exercised independent judgment in directing the employers ... [because] the dispatcher sometimes departed from the customer priority listing given them by Carrier." *Id.* at 6.  In this case, however, evidence supports a finding that Phillips did not exercise similar freedom.  Rather, Phillips performed tasks of a routine and clerical nature without using the requisite "independent judgment," and his own supervisors were generally present during the operation to decide policy matters.

age contractor. He is the only source of the evidence Foreman's drivers were not hired because of their union affiliation. He is the only source of evidence that applying for jobs with Sherwood would be futile—a prerequisite for excusing the employees' failure to ever seek employment with Sherwood or with the personnel agency from which it obtained its drivers.

■ If Phillips were not a supervisor with authority to hire and fire at the pertinent times then the employees' testimony about what Phillips said would be inadmissible hearsay not subject to the "admission by a party-opponent" exception.[9] *See* Rule 801(d)(2)(D) (statement made by party-opponent's agent must concern a matter within the scope of his employment); *Hill v. Spiegel, Inc.,* 708 F.2d 233, 236–37 (6th Cir. 1983) (claim under ADEA); *NLRB v. Process and Pollution Control Co.,* 588 F.2d 786 (10th Cir.1978) (error for an NLRB ALJ to admit hearsay improperly). The NLRA, § 10(b), requires hearings before an ALJ "so far as practicable, [to] be conducted in accordance with the rules of evidence applicable in the district courts of the United States." 29 U.S.C. § 160(b). The evidence does not support the ALJ's conclusion that Phillips was a supervisor when all new drivers were hired by Sherwood on Emery's instructions. Although Phillips was in charge of administering the DOT tests, he did not have authority to hire new drivers.

■ Even under the Board's factual findings, Sherwood had hired its full complement of drivers before any of the statements concerning Sherwood's anti-union sentiment allegedly were made. Thus, before any of the Foreman drivers could have been dissuaded from seeking employment with Sherwood, Sherwood had satisfied all of its employment needs. The Board cites *Kallmann v. NLRB,* 640 F.2d 1094, 1099–1100 (9th Cir.1981), for the proposition that because Sherwood did not inform the Foreman employees of how to obtain jobs before the jobs were filled, their failure to

apply is excusable. In *Kallman,* however, the court found that the employer had used "unusual" hiring procedures "designed to conceal the availability of jobs from the former (union) employees." *Id.* at 1099. Here, on the other hand, *Emery* had outlined its specifications for hiring drivers—it wanted a completely new driver work force—and Sherwood had always anticipated contracting with a personnel agency for its drivers. *Kallmann,* thus, is distinguishable. Sherwood was, moreover, a separately owned entity from Foreman, with no common identity except for dispatcher Phillips.·

■ It was Emery which, without dispute in this record, initiated a new contracting entity because of its dissatisfaction with Foreman. Sherwood was never shown to have been the causative force in securing an entirely new work force.

### III. CONCLUSION

Substantial record evidence does not support the Board's findings. The Board's finding that during the relevant period at the beginning, Phillips held a supervisory position with Sherwood was supported only by inference upon inference and ignored uncontroverted evidence showing that he was hired initially only as a dispatcher. Furthermore, substantial uncontradicted evidence supports Sherwood's claim that Emery was the motivating factor in not hiring Foreman employees as a condition to its receiving the drayage contract. Thus, Sherwood conclusively demonstrated "that the adverse action would have been taken even in the absence of the protected conduct," and thus could not have violated the Act. *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 2471, 76 L.Ed.2d 667 (1983); *NLRB v. Valley Plaza, Inc.,* 715 F.2d 237, 241 (6th Cir.1983).

Because we do not find substantial evidence supporting the Board's decision, we need not address whether Sherwood was a

---

**9.** Technically admissions by a party-opponent are non-hearsay statements, *see* Fed.R.Evid.

801(d)(2), rather than admissible hearsay statements. *Cf.* Fed.R.Evid. 803 and 804.

successor-in-interest of Foreman nor another substantial issue raised by Sherwood, namely whether the Board's order was impermissibly overbroad.

Accordingly, the National Labor Relations Board's application for enforcement is DENIED.