**AMERICAN PRESS, INC., Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner,**

**Graphic Communication International Union, Detroit/Toledo, Local 289, Intervenor.**

Nos. 86–5935, 86–6061.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 17, 1987.

Decided Nov. 20, 1987.

John P. Caponigro (argued), Frasco, Hackett and Mills, Bloomfield Hills, Mich., for petitioner, cross-respondent.

Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., Helen L. Morgan, Steven C. Smith, and William R. Stewart (argued), Detroit, Mich., for respondent cross-petitioner.

Roger J. McClow, Klimist, McKnight, Sale & McClow, Southfield, Mich., for Graphic Communication Intern. Union, intervenor.

Before MARTIN, JONES and WELLFORD, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

American Press, Inc., seeks review of the National Labor Relations Board's decision and order finding that the company engaged in unfair labor practices in violation of sections 8(a)(1), (3), and (5) of the National Labor Relations Act. 280 N.L.R.B. No. 109 (June 24, 1986). The record supports the Board's decision and, except insofar as noted, we grant enforcement of the Board's order.

## I.

In essence, this case involves a successorship employer at a small print shop which hired all of the former employer's non-unionized employees while failing to hire most of its unionized employees. Additional evidence, both direct and circumstantial, indicates that American Press's failure to hire unionized employees stemmed from anti-union animus.

Rite–Way Press, Inc., operated a commercial printing business in Detroit from 1964 until 1983. It was owned in equal shares by Vito Denaro, Norbert Augustyn, and Fred Rouls. Rite–Way leased its shop from a partnership known as Bard, made up of the three owners and one former owner. Denaro performed three jobs for Rite–Way: salesman, production manager, and press operator. Rouls was semi-retired, but he handled two sales accounts. Augustyn was a die cutter and shop worker. A fourth individual, Harrison Parker, was the business manager and corporation president from April 1981 to January 1983.

Ten production employees had been represented by the Graphic Communications Union since the mid–1970's, and the most recent collective bargaining agreement was to expire on May 1, 1983. Because of Rite–Way's financial difficulties, however, that agreement was modified in December 1981, and employee wages were frozen for a specified period. At that time, Rite–Way also agreed to purchase a two-color, high-speed Heidelberg press in order to produce more work of a higher quality. The two employees who had operated this valuable piece of machinery were the only unionized employees hired by American Press when it bought Rite–Way.

American Center Studios was a graphic arts business owned by American Motors Corporation providing layout, typesetting, design, and photography services. It also owned a print shop. In December 1982,

American Motors sold Studios to two of its managers, Robert Hunter and Donald Decker. This transaction did not include the print shop. Studios then brokered its printing to the American Motors Shop, as well as others in the Detroit area, including Rite-Way.

The evidence indicates that, before Hunter and Decker bought Studios, they had spoken to Denaro and Parker. Hunter and Decker informed them of the possible purchase of Rite–Way. Parker testified that, when he asked hypothetically what might happen to Rite–Way's employees if Rite–Way were purchased, Hunter replied that he and Decker did not want to be involved with the union.

In March 1983, Denaro called Hunter to ask if Studios was interested in buying Rite–Way. An inspection of Rite–Way's equipment resulted in a proposal by Studios in May or June to purchase the equipment. Hunter and Decker were particularly interested in the Heidelberg press. Studios also offered jobs to the three Rite-Way owners. The men then discussed all of the Rite-Way employees and their jobs. Denaro described all of his workers as "good" or "excellent", and he told Hunter and Decker that they would all be interested in working for Studios. Denaro told them that the production employees belonged to a union, and he provided them with a copy of the contract. He also told Hunter and Decker that they would find it helpful to keep Rite–Way's two office employees, estimator Sherwood Kogelshatz and secretary Belinda Young–Werner.

Rite–Way's owners accepted Studios' offer in July. The deal included: (1) a provision for Rite–Way's owners to have nineteen percent of the new corporation, (2) employment contracts with Denaro and Augustyn, and (3) an agreement that the corporation would lease the building from Bard.

Studios' production manager, Bernard Johnson, accepted the offer to be the new shop's general manager. Johnson and Hunter decided that, rather than use Studios' production employees, they would place "blind" help-wanted ads in two Detroit newspapers from July 30 through August 7. On August 12, Denaro signed the purchase agreement which provided that the new company would purchase all of Rite–Way's business and assets, except for certain specific items. The company agreed to pay Rite–Way $25,000 and assume its debt on the Heidelberg press. The agreement specifically provided that the company would not "assume any liability in connection with ... a labor union ... currently under contract with [Rite–Way]."

A regularly-scheduled collective bargaining meeting took place on August 12 between Denaro (as Rite–Way's representative), union official Gerald Deneau, and Rite–Way shop steward Norman Wilson. Denaro denied Deneau's charge that he had heard Rite–Way was being taken over by American Press, and he denied that there were plans to close the shop for a couple of weeks and reopen without the union.

On August 30, Deneau was notified by Rite–Way's attorney that it was terminating its business operations and that its unionized employees would be permanently laid off as of September 12. When Deneau met with attorney Boyer, Denaro, and Wilson on September 2, Boyer claimed that the shop would not be operated after the closing and that Rite-Way was looking for another tenant. Denaro also denied that he would be employed by Rite–Way's buyers, and he claimed to be looking for other work.

Around early September, Hunter and Decker offered jobs to Rite-Way estimator Sherwood Kogelschatz, to secretary Belinda Young–Werner, and to Rite–Way's two other salesmen, Chuck Reich and Pat Byrne. These people constituted all of Rite–Way's non-unionized employees.

On September 6, Denaro announced that Rite–Way was closing. When asked whether the business would reopen, he declined to comment further. He also told employees that neither he nor Augustyn had jobs. Thus, at this point, Denaro was still attempting to conceal the nature of the transaction and the possibility of the employees' future employment.

Shortly after this announcement, Denaro made assurances to production employees Calvin Casteel, Robert Bolda, and Edward Rye that they would not have to worry about jobs. He told Casteel that the shop would "open back up" under the name American Press and that he, Augustyn, and Rouls would be part owners. At this point it was reasonable for the employees to believe Denaro spoke for American Press.

On September 15, the old and new owners met to close the purchase. Denaro and Augustyn signed a 36–month agreement for full-time employment. Each was to get a salary plus three-percent of the sales to Rite–Way customers, up to a stated maximum. Each purchased nine-and-a-half percent of the stock in the new company.

The additional testimony credited by the administrative law judge indicates that American Press hired Rye and Drury, the press operators, and that it offered a job to Roger Young, another production employee, who declined. These were the only unionized employees offered work by the new company. Johnson told both Rye and Drury that the company "was starting off as a non-union shop."

Other union members sought work at American Press unsuccessfully. John Mohan sent his resume to the post office box listed in the company's "blind" advertisement. Because he later learned the ad was placed by American Press, he did not submit another application to the shop. Robert Bolda came to the company in December to fill out a job application, and he was told by Johnson that he would have to make an appointment to get an application. Bolda never returned to make such an appointment. Calvin Casteel contacted Johnson about a job, and he was told that, if Johnson needed bindery help, he'd let Casteel, his wife, and his mother (all former Rite–Way employees) know. Subsequently Denaro speculated as to why Johnson had not called Casteel, stating "the only thing I could figure out is that he figures you and [your wife] might want the union back." When Casteel later asked Johnson how he was set for help, Johnson replied that he had all the help he needed, and he added, "I don't want any problems with the union. I have had enough of Local 289 to last me the rest of my life."

## II.

Based on the foregoing facts, the Board affirmed the administrative law judge's finding that American Press violated sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3), by refusing to hire seven Rite–Way unionized employees. The Board further concluded that American Press was the successor employer to Rite–Way and that it violated sections 8(a)(1) and (5) of the Act, 29 U.S.C. §§ 158(a)(1) and (5), by refusing to recognize and bargain with the union and by unilaterally changing the terms and conditions of the unionized employees' employment. Finally, the Board concluded that the company violated section 8(a)(1), 29 U.S.C. § 158(a)(1), by telling employees they would not be hired because of their union affiliation.

The Board then ordered the company to cease and desist from the unfair labor practices and from interfering with the employees' section 7 rights. It ordered American Press to offer the seven employees reinstatement with backpay and to discharge any other employees as necessary to make room. The Board also ordered the company to bargain with the union upon request and to reinstate the wages and terms and conditions of employment existing previously.

## III.

■ The central issue in this case is whether American Press is a successor employer to Rite–Way. Ordinarily, a successor employer is free to set initial hiring terms without first bargaining with the union. Where it is clear that the new employer plans to retain all of the employees in the unit, however, the successor must consult the union before altering the terms and conditions of employment. *NLRB v. Burns Security Services*, 406 U.S. 272, 294–95, 92 S.Ct. 1571, 1585–86, 32 L.Ed.2d 61 (1972). The evidence here indicates that, but for the employer's unlawful discrimination, all of the former employees

would have been retained. An employer may not defeat a finding of successorship through its own discrimination.

■ American Press has gone to great lengths to try to convince us that its failure to hire the Rite–Way unionized employees was not motivated by anti-union animus. Primarily, it argues that Bill Denaro was not an agent of American Press and that, therefore, his alleged statements were hearsay not within the "admission of a party opponent" exception.

We believe that because Denaro owned nine-and-a-half percent of American Press, and because he had been authorized to tell his former employees to submit applications to the company, he was American Press's agent. Even without finding Denaro was an agent, however, there is enough evidence of the company's anti-union animus to support the Board's conclusion.

### A.

As to Denaro's agency, we believe that the facts support his actual or apparent authority to speak on behalf of American Press under the broad interpretation applied in this kind of case. The National Labor Relations Board has held that the test to be applied is "whether, under all the circumstances, the employees could reasonably believe that an employee was reflecting company policy, and speaking and acting for management...." *Aircraft Plating Co.*, 213 N.L.R.B. 664 (1974). Indeed, we have held that strict principles of agency are not applicable when management uses an employee to effectuate its own interest. *NLRB v. Dayton Hotels*, 474 F.2d 328, 331 (6th Cir.1973). This type of agency liability is further established when employees have close ties with management, and when there is evidence indicating the company acquiesced in the employee's activity. *See, id.*

Here, Denaro was a former owner of Rite–Way, a part owner of American Press, and, while he was not a supervisor, he was given an assignment by American Press to solicit job applications from those of his former employees whom he thought would fit the new company's needs. Denaro's many meetings with the new owners estab-

lish his close ties with management, thus making it reasonable for employees to believe that he was speaking and acting for management, despite the fact that for a time he concealed his full interest in the new company.

This case is distinguishable from *Dick Seidler Enterprises, d/b/a Joe & Dodie's Tavern*, 254 N.L.R.B. 402, 411 (1981). In *Dick Seidler Enterprises*, a former owner who played no active role in the operation of a new restaurant was found not to have been an agent of the new business. The former owner's only interest was that he was to receive monthly payments on a promissory note over a period of fifteen years. Here, however, Denaro remained an owner, remained an employee, and was authorized by the new owners to solicit applications from former employees. In addition, his involvement in hiring and his obvious interest in the fate of his former employees gave him "close ties" with management. Thus, the employees would reasonably believe that he spoke for company management and that he had direct knowledge of its motivation for hiring decisions.

Because of Denaro's ownership and involvement in the company, we believe this case is easily distinguishable from *NLRB v. Sherwood Trucking Co.*, 775 F.2d 744, 749 (6th Cir.1985). In *Sherwood Trucking*, a trucking dispatcher was found not to have been an agent of the company because he had no financial stake in the company, was not authorized to hire or fire drivers, and was not a supervisor at the time he made the statements.

### B.

■ In addition, even without the statements made by Denaro, there is substantial evidence to support the Board's findings of anti-union animus on the part of American Press. Indeed, unlike the situation in *Sherwood Trucking*, there is no other reasonable explanation for the company's pattern of hiring.

First, Parker testified that, at dinner in 1982, Hunter stated that he did not want to have to deal with the union. The adminis-

trative law judge credited Parker's testimony, calling him the only disinterested witness. Although American Press has tried to characterize this statement as a protected one because it was not accompanied by a threat, we believe that it was nonetheless an admission of Hunter's intentions. Though the statement alone may not have been a violation, it gives meaning to Hunter and Decker's subsequent actions. This intention was later confirmed by the company's general manager, Johnson, when he told Rye and Drury in their interviews that the company would be starting off as a non-union shop.

Second, we have Johnson's statement to Casteel on October 25 that he had had enough of Local 289 to last him the rest of his life. American Press argues that, by the time this statement was made, it had already hired its full complement of production employees. Thus, American Press seeks to analogize to the case in *Sherwood Trucking*, 775 F.2d 744, 750, where we found the full complement of drivers had been hired before any of the former drivers could have been dissuaded by the statement. We are not persuaded.

We find this case to be much closer to *Kallman v. NLRB*, 640 F.2d 1094 (9th Cir. 1981). In *Kallman,* the evidence showed the employer had gone to great lengths to conceal the availability of jobs from former unionized employees, thus excusing their failure to apply. *Id.* at 1099–1100. The evidence in this case supports the same conclusion. The circumstantial evidence is plentiful. All of Rite–Way's non-unionized employees were hired, while only two of its unionized employees were. Only one other unionized employee was offered a job, while the inquiries and applications of others were denied or ignored. There is no evidence of a legitimate reason for this discrepancy. Moreover, the evidence shows that the company was actively trying to prevent the union members from learning of the company's sale and imminent reopening. Denaro continued to deny rumors that the company had been purchased and that he had a job with the new owner. The company continued to run blind advertisements in the newspaper while qualified former Rite–Way employees remained available for employment. It also conducted the interviews away from its new shop.

This conduct, while perhaps not as flagrant as that in *Kallman,* constitutes substantial evidence of American Press's anti-union animus. The Board reasonably concluded that, but for these anti-union sentiments, American Press would have employed the majority of Rite–Way's unionized employees, fulfilling the most important requirement of the successorship test.

■ As for the other successorship requirements, there is no real dispute: (1) American Press continues virtually the same operations, except that it now serves many clients in addition to Rite–Way's; (2) American Press uses the same plant or location that Rite–Way used; (3) basically, the same jobs exist under the same conditions, except that wages have been altered in violation of the Act; (4) the same machinery, equipment, and production methods are used; and (5) the same products and services are offered. *Border Steel Rolling Mills, Inc.*, 204 N.L.R.B. 814, 815 (1973).

Thus, other than inconsequential differences, the only requirements missing are the identity of supervisors and the identity of the work force. *See id.* There is no evidence to indicate that anyone other than Johnson would have been the supervisor. Either Denaro or Augustyn had performed this role at Rite–Way, and there was no discrimination in not hiring them. As we have already discussed, "but for" American Press's anti-union animus, the work force would be virtually the same. Therefore, we believe the Board was correct in its finding of successorship and in finding all of the violations listed above.

■ We do not find, however, that the failure to hire two other former employees, Robert Bolda and Stella Roulette, was motivated by anti-union animus. The facts indicate that Bolda became aware that American Press was hiring. He came to the plant without an appointment. There he was told by Johnson he would have to make an appointment to get an application. Bolda failed to do so. Although this may

indicate reluctance on the part of American Press to hire Bolda, we do not believe there was enough evidence to support the Board's conclusion as to Bolda. Because the evidence indicates that Stella Roulette, Calvin Casteel's mother, was not a member of the union, we do not believe the company's failure to hire her was based on any anti-union animus. Therefore, we reverse the Board's findings as to these two employees, and we alter its remedial order for reinstatement and backpay for Bolda and Roulette.

It is true that, other than John Mohan, none of the remaining seven employees made formal applications for jobs at American Press. This fact, however, does not defeat their claims. American Press did what it could to keep the Rite–Way bargaining unit employees from knowing it was accepting applications. "In such circumstances, employees cannot be faulted for failing to apply...." *Karl Kallmann d/b/a Love's Barbeque Restaurant No. 62,* 245 N.L.R.B. 78, 81 n. 10 (1979). In addition, where an employer makes known to prospective employees his refusal to hire them because of union affiliation, their failure to apply is no defense. *Id.*

The remaining employees were Calvin Casteel, Charlotte Casteel, Gale Willard, and Norman Wilson. The evidence indicates that both Willard and Wilson were unaware American Press was accepting applications. The Casteels were repeatedly told that, if American Press were hiring, Johnson would get in touch with them. Therefore, their failure to apply was brought about by American Press's effort to conceal the fact that it was hiring and thus will not operate as a defense to American Press's 8(a)(3) violation.

We affirm the rest of the Board's conclusions, and we grant the enforcement of the remainder of the order.

WELLFORD, Circuit Judge, concurring:

I concur with some hesitation with respect to the agency issue in this case, Denaro's authority to bind American Press

under the circumstances. *NLRB v. Dayton Hotels,* 474 F.2d 328 (6th Cir.1973), counsels that to hold the speech or actions of an employee to bind the employer there must be some real connection between management and the employee's conduct, "either by way of instigation, direction, approval, or at the very least, acquiescence." The other employee's belief that Denaro might speak for management, in my view, is not enough, and Denaro's relatively insignificant ownership interest and minor part in decisionmaking with regard to hiring makes his agency status suspect. Nor do I find this case so easily distinguishable from *NLRB v. Sherwood Trucking Co.,* 775 F.2d 744 (6th Cir.1985). The case is very close on this critical question, but I concur, considering the evidence of anti-union animus on the part of American Press, among other factors that might support the Board.

I concur that Bolda and Roulette are not entitled to reinstatement and back pay, and in the other portions of Judge Martin's opinion.