**UNITED MINE WORKERS OF AMERICA LOCAL UNION 1329, et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 85–1734.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 21, 1987.

Decided March 3, 1987.

Daniel B. Edelman, with whom Michael H. Holland and Kurt Kobelt, Washington, D.C., were on the brief for petitioners.

Michael David Fox, Nat. Labor Relations Bd., with whom Elliott Moore, Deputy Associate Gen. Counsel, Robert E. Allen, Associate Gen. Counsel and Peter Winkler, Nat. Labor Relations Bd., Washington, D.C., were on the brief for respondent.

Before EDWARDS, RUTH BADER GINSBURG, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Petitioners United Mine Workers of America (UMWA), UMWA Local 1329, and UMWA District 21 appeal a decision of the National Labor Relations Board (the Board) holding that picketing by petitioners at two coal mines violated 29 U.S.C. § 158(b)(7)(C), forbidding labor organizations from picketing an employer for recognition for more than thirty days without filing an election petition pursuant to 29 U.S.C. § 159(c). The Board's ruling against petitioners was premised on its conclusion that the purchaser of two coal mines was not a "successor" to the mines' previous owner for the purposes of recognizing and bargaining with the UMWA. *See NLRB v. Burns Int'l Security Serv. Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972) (*Burns*). On appeal, petitioners contend principally that the purchaser of the mines was a *Burns* successor and that the picketing therefore cannot be regarded as recognitional. We vacate the Board's order for the reasons set forth below and remand the case for further consideration consistent with this opinion.

I

The UMWA had been recognized by Garland Coal & Mining Co. (Garland) as the bargaining representative of the production and maintenance employees at the Tamaha and Rose Hill mines in Haskell County, Oklahoma. On March 26, 1981, the collective bargaining agreement between Gar-

land and the UMWA expired and the employees went on strike and began picketing. A few weeks later, Garland began operating the mines with non-union replacements. In March 1982, Garland notified the UMWA that it was closing the Tamaha and Rose Hill mines permanently and offering them for sale. Garland did close the two mines and on June 24, 1982, sold the mine equipment, ground leases, and assets to Alpine Construction Corp. (Alpine). Shortly after commencing operations, Alpine filed charges against the strikers, alleging a violation of 29 U.S.C. § 158(b)(7)(C). After a hearing, the Administrative Law Judge (ALJ) found against petitioners on March 30, 1984, and the Board affirmed on September 24, 1985.

## II

■ It is well established that a new employer, having acquired an existing business, may be required to bargain with a union that had previously been recognized as the employees' representative for the purpose of bargaining with their old employer if there has been "substantial continuity of the employing industry" in spite of the acquisition. *Miami Industrial Trucks*, 221 N.L.R.B. 1223, 1224 (1975). The Supreme Court gave this obligation more specific content in *Burns*, which held that "where a majority of employees hired by the new employer are represented by a recently certified bargaining agent," 406 U.S. at 281, 92 S.Ct. at 1579, and where the "operational structure and practices" of the new employer do not differ from those of the previous employer, *Id.* at 280, 92 S.Ct. at 1578, the new employer must recognize and bargain with the existing union.

■ Thus, under *Burns* there are two preconditions to the obligation of a new employer to recognize a union: a majority of the employees must have worked for the predecessor employer, and there must be continuity of operations. If the new owner purposefully avoids hiring union members to escape designation as a *Burns* successor, however, the requirement that a majority of the new owner's employees belonged to the pre-existing bargaining unit is

waived. *Potter's Drug Enterprises*, 233 N.L.R.B. 15 (1977); *C.J.B. Industries*, 250 N.L.R.B. 1433 (1980). Waiver of this requirement does not relieve the bargaining agent of the need to demonstrate substantial continuity in the employer's operations.

Recently, in *United Food & C. Workers I. Union v. NLRB*, 768 F.2d 1463 (D.C.Cir. 1985) (*Spencer Foods*), this court emphasized that the reason for requiring substantial continuity was to ensure that employee attitudes toward representation have not been altered because of changes in the circumstances of their employment, i.e., to ensure that the union can still fairly be presumed to command majority support in the unit. Thus, in *Spencer Foods*, we reversed the Board because it had determined that the employer was not a successor in a decision that merely enumerated changes in the company's operation without explaining how they might have affected employee attitudes toward representation by the incumbent union. Some, such as changes in the identities of customers and suppliers, had no apparent bearing on that subject at all.

## III

■ Because we find that the Board's decision in this case suffers from the same defect as the ruling overturned in *Spencer Foods*, we vacate the Board's order and remand the case so that the Board may relate changes in the operation of the Tamaha and Rose Hill mines to possible changes in employee attitudes toward representation by petitioners. While the changes mentioned by the Board in this case were not so obviously irrelevant as the example cited from *Spencer Foods* above, neither are they so obviously relevant that the Court can avoid remanding this case for the Board to relate them in the first instance to the necessary effect on employee attitudes. The ALJ did not have the benefit of our decision in *Spencer Foods*, but that opinion and others to like effect, cited in *Spencer Foods*, 768 F.2d at 1470, were available to the Board on review. The Board, however, did not attempt to conform its analysis to those cases.

For example, in *International Union of Electrical Workers v. NLRB*, 604 F.2d 689 (D.C.Cir.1979), we explained that changes in an employer's internal organization, arising from a change in ownership, do not necessarily make the bargaining unit an inappropriate one, because

> [t]he essential inquiry is whether operations, as they impinge on union members, remain essentially the same after the transfer of ownership. *See NLRB v. Zayre Corp.*, 424 F.2d 1159, 1162 (5th Cir.1970), *cited with approval in NLRB v. Burns Security Services, Inc.*, 406 U.S. at 281, 92 S.Ct. 1571 [1579].

*Id.* at 694. In that case, we determined that a company's shift from centralized to local control of plants and changes in the size of the bargaining units did not preclude a finding of successorship. *Id.* at 694–695.

Other circuits have also emphasized the need to relate changes in operations to their effect on employee attitudes toward representation. The Ninth Circuit has noted that the basic rationale of the *Burns* successorship doctrine "is that a mere change in ownership, without an essential change in working conditions, would not be likely to change employee attitudes toward representation." *Premium Foods, Inc. v. NLRB*, 709 F.2d 623, 627 (9th Cir.1983) (emphasis omitted). In that case, the court determined that, despite the introduction of a new product line and some changes in management procedures, the employer was a successor because the employees were using the same skills and tools as before and the nature of the employing industry was basically unchanged. *Id.; see also NLRB v. Band-Age, Inc.*, 534 F.2d 1, 6 (1st Cir.1976) (change in size of workforce and number of products did not affect employee attitudes); *NLRB v. Boston Needham Indus. Clean. Co.*, 526 F.2d 74, 77 (1st Cir.1975) (changes in operations would not significantly affect employee attitudes); *Zim's Foodliner, Inc. v. NLRB*, 495 F.2d 1131, 1142 (7th Cir.1974) (employer must show some objective basis for doubting union's continued representative status). More recent cases in the same circuits have confirmed the necessity of a plausible connection between changes in operations and supposed changes in employee attitudes. *See NLRB v. Jarm Enterprises, Inc.*, 785 F.2d 195, 200–01 (7th Cir.1986); *NLRB v. Fall River Dyeing & Finishing Corp.*, 775 F.2d 425, 429 (1st Cir.1985); *NLRB v. Jeffries Lithograph Co.*, 752 F.2d 459, 466 (9th Cir.1985).

■ Admittedly, the courts have been less than pellucid in illustrating just how the Board is to relate particular changes in operations to a putative effect on employee attitudes toward representation. Surely it is for the Board in the first instance, however, to determine whether and how changes in employment conditions could plausibly be expected to affect employee attitudes toward representation by the previously certified bargaining agent. To be sure, the Board may make reasonable presumptions in order to perform this task. A very exacting standard, such as determining the actual effects of various changes in operations on employee attitudes toward representation, is probably not workable— short of conducting a representation election—and certainly not necessary. Still, the Board must make some reasonable effort to relate the operational discontinuities it recites to the ultimate discontinuity it finds in the presumption of majority status. We have no occasion to elaborate, however, for here the Board made no such attempt.

IV

In the case before us, the ALJ found that Alpine had an anti-union animus, but stopped short of determining whether an anti-union hiring policy was the cause of Alpine's hiring only a minority of its employees from its predecessor's workforce, Joint Appendix at 37; the Board, having found insufficient continuity of operations for Alpine to be a "successor" employer, did not deal with this question. If the Board on remand, applying the principle of *Spencer Foods*, concludes that there was continuity of operations between Garland and Alpine, then it must further consider whether the fact that Alpine's workforce does not include a majority of former Gar-

land employees is attributable to an anti-union hiring policy on the part of Alpine.

We express no conclusions as to the merits of either issue remanded to the Board.

For the reasons stated in this opinion, the order of the National Labor Relations Board is

*Vacated and remanded.*