**Mary Zelma ASSEO, Regional Director for Region 24 of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**EL MUNDO CORPORATION a/k/a Worldwide Management Corporation, Respondent.**

**Civ. No. 88–1338(RLA).**

United States District Court, D. Puerto Rico.

Feb. 6, 1989.

Antonio F. Santos, Raymond E. Morales, N.L.R.B., Hato Rey, P.R., for petitioner.

Miguel Palou Sabater, Ledesma, Palou & Miranda, Hato Rey, P.R., for respondent.

## OPINION AND ORDER

ACOSTA, District Judge.

These proceedings were instituted by Mary Zelma Asseo, as Regional Director

for the National Labor Relations Board, seeking interim injunctive relief against El Mundo Corporation a/k/a Worldwide Management Corporation pursuant to Section 10(j) of the National Relations Act, 29 U.S.C. § 160(j) pending a final decision on the merits of the underlying unfair labor practices.

An evidentiary hearing was held on August 23, 24 and 25, 1988. The Court, having reviewed the evidence presented by the parties as well as their legal arguments, hereby rules as follows.

### THE FACTS

1. El Mundo, Inc. was founded in 1919 and was engaged in the publication and distribution of a daily Spanish newspaper in the Commonwealth of Puerto Rico.*

2. On July 6, 1962, Unión de Periodistas, Artes Gráficas y Ramas Anexas, Local 225, affiliated with the Newspaper Guild Association, AFL–CIO, CLC (the Union), previously known as Puerto Rico Newspaper Guild, Local 225, American Newspaper Guild, AFL–CIO, was certified by the National Labor Relations Board to represent certain employees of El Mundo, Inc.*

3. Since 1964, El Mundo, Inc. and the Union entered into several collective bargaining agreements covering certain of El Mundo, Inc. employees the last one of which was executed on September 6, 1985 (Collective Bargaining Agreement.*

4. Since July 6, 1962, the Union has been the exclusive bargaining representative of the employees employed by El Mundo, Inc. as described in Article 1 of the Collective Bargaining Agreement.*

5. On November 26, 1986 Héctor L. González wrote to El Mundo, Inc. expressing his interest in purchasing the newspaper.

6. A meeting of the Board of Directors of the Fundación Angel Ramos, Inc., the newspaper owner, was held on August 19, 1987 where the members were advised that the Union had rejected El Mundo's labor contract at a general assembly, and also that inquiries for purchase of the newspa-

per had been received from Héctor L. González and another party. The Board concluded that if no sale was consumated within a reasonable period of time, the newspaper would be closed down.

7. At a meeting held on August 21, 1987 between Héctor L. González and the Union's top officials, González assured the Union of his interest in keeping the El Mundo newspaper operating and his interest in reaching an agreement with the Union prior to the purchase. González indicated he would assume a successor position and would voluntarily assume the predecessor's responsibilities toward the Union.

8. On August 24, 1987 González submitted a memorandum of understanding to the Union which stated the proposed terms and conditions including those pertaining to subcontracting and the Union's commitment to withdraw its complaints.

9. In a letter dated August 25, 1987, González advised the Union that he had met with them to negotiate because he was interested in buying the newspaper, was pleased with the negotiations with the Union, and discussed the items agreed upon which were to be included in the Collective Bargaining Agreement.

10. On or about August 30, 1987, El Mundo, Inc. closed its business operations and terminated all of the employees included in the Unit described in Article 1 of the Collective Bargaining Agreement. Most of the employees of El Mundo, Inc. were given severance payments pursuant to Article III of the Collective Bargaining Agreement.*

11. On November 2, 1987 the Union approved a resolution to withdraw the pending unfair labor practice complaints to allow for the purchase of the newspaper by González. The withdrawal would be simultaneous with the purchase and conditioned upon the adoption of the terms included in the memorandum of understanding.

12. By letter dated September 4, 1987 the lawyer for González submitted an offer to Fundación for the purchase of the El

---

* Statement of uncontested facts in pretrial order.

Mundo, Inc. stock for $3 million; $1.5 payable at closing and the balance in 6 consecutive annual installments.

13. A meeting was held on September 5, 1987 between González and the Union's bargaining committee to further discuss a possible agreement. González indicated that the newspaper had been published during 68 years, and of his intention of restructuring it to make it a viable operation.

14. At an assembly of the Union membership held on September 10, 1987, González advised those members present of his commitment to keep the newspaper operating. He also stated that he had been engaged in productive talks with the Union and that there were no obstacles remaining for the purchase of the stock.

15. On September 11, 1987, Héctor L. González paid Fundación Angel Ramos, Inc. $1,500,000.*

16. On September 15, 1987, González wrote a letter to the Union with a proposal for a new agreement to be effective once the sale of the newspaper stock took place.

17. On September 17, 1987, José Iván Aldea, an employee of Héctor L. González, verbally notified the Union of the names of the employees of El Mundo, Inc. who would be recalled to work upon respondent's commencement of business operations. José Iván Aldea also informed the Union that an additional 110 employees from the Circulation Department would be recalled. The breakdown of employees that were going to be recalled in each department was as follows:

| | |
|---|---|
| Editorial | 31 |
| Advertisement/Sales | 4 |
| Production | 28 |
| Circulation | 110 |
| Transportation | 0 |
| Maintenance | 6 |
| MIS | 4 |
| Accounting | 10 |
| Personnel and Administrative Services | 4 |

In addition, Héctor L. González was going to offer 24 employees from El Mundo, Inc., independent contractor positions at the Circulation Department. This information was supplied to Héctor L. González by José Iván Aldea in a memorandum dated September 18, 1987 where he gave a summary of the recall of Union employees by department.

18. On September 21, 1987 the Union issued a press release advising that the reopening of the newspaper might not come through and that González was backing away from his original position.

19. A September 26, 1987 draft letter from González to Fundación stated the terms of the purchase of stock of El Mundo, Inc., however, there is a line crossing out "stock" which was replaced by the word "assets."

20. The final offer for the purchase of assets was made by letter dated September 28, 1987.

21. In an October 2, 1987 letter to the Union counsel for the newspaper advised of the effects of the Collective Bargaining Agreement on the cessation of operations and the steps to be taken for the closing down of the newspaper.

22. At a Fundación Board of Directors meeting held on October 7, 1987, the sale of assets to González was approved.

23. On October 23, 1987 Jorge Santelli, of Abitibi–Price Sales Corp., mailed a letter to González indicating it would continue to do business with the new newspaper corporation.

24. On November 2, 1987, José Iván Aldea prepared a memorandum on employee staffing with the salaries, fringe benefits and organization of the newspaper.

25. On November 8, 1987, El Mundo, Inc. and Worldwide Management Corporation executed an Asset Purchase Agreement whereby respondent purchased the assets and business of El Mundo, Inc.

26. On November 8, 1987, El Mundo, Inc. and Worldwide Management Corporation executed a lease agreement whereby respondent leased the premises where the newspaper had been operating.

27. On December 4, 1987, Sergio Camero, respondent's president, prepared a memorandum on employee recruitment by department, position, and names (for those positions already filled) and projections as

to when certain positions had to be filled. He noted that adjustments might have to be made since the plan had been designed with the full production of the enterprise in mind.

28. On December 16, 1987, the Union mailed a letter to Héctor L. González requesting a meeting to discuss the terms and conditions of employment of the employees of El Mundo Corp. according to the conversations/agreements which took place prior to the purchase.

29. On December 22, 1987, Héctor L. González delivered to the Union by messenger a letter dated December 21, 1987 where he explained that since he had unsuccessfully tried to purchase the shares of the newspaper and since probably less than 25% of the new employees would involve former employees, it was his understanding that the Union was not a majority, and thus, it could not be imposed upon the employees.

30. On January 28, 1988, respondent prepared a memorandum on employee benefits.

31. On February 2, 1988, respondent prepared a memorandum on employee salaries.

32. The following is a summary of the number of employees and supervisors hired by respondent from November 9, 1987 to February 25, 1987 and of how many of those were previously employed with El Mundo, Inc. (taken from paragraphs 32–44 of the uncontested facts in the pretrial order).

| Date Employed | Employees Previous Employees | + | Area Supervisors Previous Employees | = | Total Non Superv. Employees Previous Employees | + | Supervisors Previous Employees | = | Total Employees |
|---|---|---|---|---|---|---|---|---|---|
| 11/9/87– | 36 | | 20 | | 56 | | 20 | | 76 |
| 12/16/87 | 16 | | 11 | | 27(48%) | | 8 | | 35 |
| Total as of | 45 | | 20 | | 65 | | 21 | | 86 |
| 12/21/87 | 18 | | 11 | | 29(44%) | | 8 | | 37 |
| 12/22/87– | (+76**)(+ | | (+5)25 | | 146/148 | | (+2)23 | | 169/171 |
| 02/25/87 | (+18**)(+19**) | | (+4)15 | | 51/52(34/35%) | | 8 | | 59/60 |
| | 121/123 | | | | | | | | |
| | 36/37 | | | | | | | | |

33. From November 9, 1987 through August 5, 1988, respondent hired 3 former El Reportero employees as Area Supervisors.*

34. From November 9, 1987 through August 5, 1988, respondent hired 17 former El Reportero employees, in addition to those hired as Area Supervisors.*

35. The Comptroller of El Mundo Corporation is Luis Canals.*

36. On December 29, 1987 and April 26, 1988 the Union filed a charge and an amended charge, respectively, in Case No. 24–CA–5714, alleging that respondent engaged in, and is engaging in unfair labor practices within the meaning of Section 8(a)(1), (3) and (5) of the Act.***

37. On March 16, 1988 and April 26, 1988, the Union filed a charge and an amended charge, respectively, in Case No. 24–CA–5761, alleging that respondent engaged in, and is engaging in unfair labor practices within the meaning of Section 8(a)(1) and (3) of the Act.***

38. The above-mentioned charges and amended charges were referred to petition-

** There is a slight discrepancy in these categories. *See* paragraphs 40, 43, 44, *infra.*

*** Admitted in the answer to the complaint.

er as Regional Director for Region 24 of the Board for appropriate investigation.***

39. Upon said charges and amended charges, the General Counsel of the Board, on April 29, 1988, issued an "Order Consolidating Cases, Consolidated Complaint and Notice of Hearing"; on June 2, 1988, issued an "Amendment to Consolidated Complaint"; and on July 15, 1988, issued a "Second Amendment to Consolidated Complaint", pursuant to Section 10(b) of the Act, alleging that respondent has engaged in, and is engaging in unfair labor practices as charged within the meaning of Section 8(a)(1), (3) and (5) of the Act.***

40. From at least August 31, 1987 to January 8, 1988, respondent's name was Worldwide Management Corporation. On January 8, 1988, respondent changed its name to El Mundo Corporation, the name by which it is presently known.***

41. Respondent, a corporation organized under the laws of the Commonwealth of Puerto Rico, has been engaged in the printing, sale and distribution of a daily newspaper and operates a facility located at Hato Rey, Puerto Rico.***

42. Based upon a projection of its operations since on or about November 9, 1987, at which time respondent commenced its operations, respondent, in the course and conduct of its business operations will annually derive gross revenues in excess of $200,000.***

43. Since on or about November 9, 1987, respondent, in the course and conduct of its business operations, has held membership in or subscribed to various interstate news services, including United Press International and Associated Press, published various nationally syndicated features, including the *Horoscope* by Jeane Dixon, *Hocus Focus* by Bob Schroeter, and *Blondie* by Young and Gersher, and advertised various nationally sold products, including General Motors automobiles and Whirlpool and General Electric products, and during the same period, purchased supplies and materials valued in excess of $50,000 directly from points and places located outside Puerto Rico.***

44. Respondent is, and has been at all times material herein, an employer engaged in commerce and in a business affecting commerce within the meaning of Section 2(2), (6) and (7) af the Act.***

45. The Union is, and has been at all times material herein, a labor organization within the meaning of Section 2(5) of the Act.***

46. At all times material herein, the following-named persons occupied the positions set opposite their respective names, and have been, and are now (except as indicated by time limitations by their names) supervisors of respondent, acting on its behalf, and at all times material herein, have been, and are now supervisors within the meaning of Section 2(11) of the Act and agents of respondent within the meaning of Section 2(2) and 2(13) of the Act:

| | |
|---|---|
| Héctor L. González | President of the Board of Directors |
| Carlos Vélez | Personnel Director—From November 1987 to April 1988 |
| Graciliano Sostre | Circulation Department Manager |
| Juan Colón | Direct Sales Manager—From November 1987 through January 30, 1988 |
| Rafael Negrón | Metropolitan Area Subscription Manager |
| Arturo Ruiz Engo | Island Manager |
| César Rodriguez | MIS Operations Supervisor *** |

47. From on or about December 7, 1987 Angel M. Noriega was an agent of respondent acting on its behalf, within the meaning of Section 2(2) and 2(13) of the Act, and has been and is now a supervisor within the meaning of Section 2(11) of the Act and an agent of respondent within the meaning of Section 2(2) and 2(13) of the Act.***

48. Since on or about November 9, 1987, and continuously thereafter, respondent has not recognized the Union as the representative of its employees for collective bargaining purposes.***

49. Respondent has assumed the position that it is not bound by the provisions of the collective bargaining contract executed by El Mundo, Inc. and the Union.***

50. El Mundo Corporation published its first newspaper on January 6, 1988.***

## 10(j) STANDARD

Section 10(j) empowers the Board to seek interlocutory injunctive relief to preserve or restore the status quo in situations where it has administratively charged an employer with an unfair labor practice. *Asseo v. Pan American Grain Co., Inc.*, 805 F.2d 23, 25 (1st Cir.1986).

The Court, in determining whether the injunction should issue must first determine whether "there is reasonable cause to believe" that the unfair labor practices charged were committed, *Scott v. El Farra Enterprises, Inc.*, 863 F.2d 670 (9th Cir. 1988); *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 748 (9th Cir.1988); *Asseo*, 805 F.2d at 25. *Maram v. Universidad Interamericana de P.R., Inc.*, 722 F.2d 953, 959 (1st Cir.1983), and if so, what is the just and proper remedy.

The Court's role is limited to reviewing the evidence presented under the "reasonable cause standard." Therefore, it is not to decide the charges on the merits nor rule on credibility issues for this is the Board's responsibility. *Asseo*, 805 F.2d at 25.

So long as the petitioner's "position is fairly supported in the evidence" she has met her reasonable cause burden. *Id.*

## VIOLATION OF 8(a)(3) AND (1)

■ An employer violates 8(a)(3) and 8(a)(1) if it refuses to hire employees of its predecessor because of their union affiliation or to purposedly avoid becoming a successor. *American Press, Inc. v. NLRB*, 833 F.2d 621 (6th Cir.1987); *Kallmann v. NLRB*, 640 F.2d 1094, 1100 (9th Cir.1981); *Shortway Suburban Lines*, 126 L.R.R.M. 1225, 286 N.L.R.B. No. 30 (Sept. 30, 1987); *Inland Container Corp.*, 119 L.R.R.M. 1089, 275 N.L.R.B. No. 60 (May 7, 1985).

### *Discrimination*

■ Petitioner, through the testimony of the witnesses presented, met her burden of establishing reasonable cause to believe that respondent incurred in specific violations of section 8(a)(3) by discriminating against applicants because of their union affiliation.

It was the testimony of two of respondent's employees that specific instructions were given with respect to the hiring practices of former employees. Hiring ex-El Mundo employees was discouraged and, instead, efforts were made to fill the positions with other personnel. Special hiring procedures applicable solely to ex-El Mundo employees were instituted which required clearance by security or the personnel department.

These, however, are not isolated examples. A pervasive anti-union animus can be reasonably deduced from the testimony of various other witnesses presented by petitioner. The evidence supports a finding of reasonable cause to believe respondent incurred in a general discriminatory scheme against ex-El Mundo employees solely because of their membership in the union.

There are ample instances of specific anti-union remarks showing a clear intent to avoid a union majority by "blackballing" persons identified with the union movement while they were employed with El Mundo, Inc.

■ Defendant contends that any evidence pointing to discrimination in the hiring of independent contractors is inadmissible to establish a violation of sections 8(a)(3) and (1) because independent contractors are not protected by these particular provisions. We agree that independent contractors are exempted from coverage. However, hiring practices of this category of workers can be examined and taken into consideration by the Court as corroborative of the discriminating employment practices used by the respondent to fill the employee positions. Furthermore, they are highly illustrative of the pervasive anti-union animus shown by the supervisors while implementing the company's hiring practices.

Sufficient evidence was presented at the hearing for the Court to find reasonable cause to believe respondent violated sections 8(a)(3) and 8(a)(1) by refusing to hire two union members previously associated with El Mundo, Inc.

Fernando Maldonado Pérez, a computer programmer employed from June 1960 to

August 1987, who applied for a position at the Electronic Processing Department (EDP) Department was advised by a supervisor of that department with whom he had worked for a long time previously, that as long as the former employees belonged to the union, they could forget about being brought back to work (TR 137).

Carlos Moreno Arroyo, who had worked with El Mundo, Inc. as a cashier in the Accounting Department from September 1971 through August of 1987, testified he was specifically told by Rafael Rivera, a supervisor and also his personal friend, that it was going to be difficult for the witness to get employment with the respondent since he had been "blacklisted" for having been a union officer (TR 177).

### Applicants for Independent Contractor Positions

Rafael García García and Luis Rivera García both of whom had previously worked with El Mundo, Inc. as district managers in the Circulation Department, and had been union officers, applied for positions within the same department once El Mundo changed owners. Both spoke with Graciliano Sostre, the director, who told Rafael he was in a "very difficult list and everything that resembles union there inside smells" (TR 157).

Sostre advised Luis that he had received specific instructions not to recruit former personnel who had been involved in union activities (TR 166).

Juan Colón Ortiz was employed by Sostre in November 1987 to work with respondent as Manager of Direct Sales in the Circulation Department. Among his duties, he had to recruit personnel to fill out employee positions within his section. He would interview and qualify applicants. According to his testimony, only former El Mundo, Inc. employees had to be cleared through security or the personnel office before employment. (TR 23) Furthermore, ex-employees would be considered

only if no other applicants were found to be qualified for the position (TR 37).

He also testified that he had difficulty in employing Fernando Lebrón, a former El Mundo, Inc. employee (TR 61), when Colón recommended hiring Francisco Rodríguez. Mr. Sostre rejected him also because he was a former El Mundo, Inc. employee (TR 61).

Roberto Jusino Serrano was employed by respondent as area supervisor. He testified that Sostre, Negrón Noriega and the personnel director specifically advised him not to recruit ex-El Mundo, Inc. employees and had stated that the Union had no place in the new corporation. (TR 76, 77, 78, 81, 88–89). The reason the witness got his job was because, according to Noriega, he had never been unionized (TR 75). Sostre told him he should keep away from former El Mundo, Inc. union members (TR 77).

Sostre was heard to say that Freddy Colón was a "bad agitator" and was blackballed because he was pro-union (TR 82). Noriega made a similar statement with respect to Damaso González, another ex-employee (TR 83).

### Purposeful Avoidance

■ The record shows that respondent violated sections 8(a)(3) and 8(a)(1) by purposely avoiding the hire of more than 35% of ex-El Mundo, Inc. employees in order to prevent becoming a "successor employer."

Petitioner established through the probable cause standard[1] that the respondent did in fact engage in a discriminatory scheme to avoid becoming a successor employer. Two witnesses testified that, while employed with the respondent, the director of the Circulation Department, in separate instances, specifically made reference to a policy of limiting the number of ex-El Mundo recruits to 35%.

Colón testified that at a meeting where the island Manager and Rafael Negrón were also present, Sostre advised them they could not hire more than 35% of ex-El Mundo employees and that since "other

---

1. Again, our role is a limited one under the statutory authority conferred pursuant to 10(j). The petitioner need only meet a threshold rea-sonable cause burden. *See Scott v. El Farra, supra; Aguayo v. Tomco, supra; Asseo v. Pan Am, supra.*

departments had needed employees, for that reason [they] could not go beyond a thirty-five percent level." (TR 23–24).

At another instance Sostre was annoyed at Negrón for suggesting for employment a former unionized employee because the percentage was going to be raised (TR 85–87).

We note with interest that the proportion of ex-El Mundo, Inc. employees recruited to fill employee positions was drastically reduced from approximately 48% on December 16, 1987, to 44% on December 21, 1987 and to precisely 34–35% on February 25, 1987 when a full complement was attained.[2]

We can infer that the 35% limit was not restricted to either the Circulation Department or the hiring of independent contractors. Sostre's statement that other departments also needed ex-employees and that whatever happened at the Circulation Department would affect the balance confirms this.

## SUCCESSORSHIP

■ The Supreme Court has adopted the Board's doctrine of successor employer whereby a new owner, under a particular factual situation, will be bound by his predecessor's labor obligations to recognize and bargain with a previously existing union. Pursuant to this doctrine, a purchaser of a business will have to recognize and bargain with a pre-existing union should there be: (1) a majority of ex-employees hired and (2) "substantial continuity" of the operations. *See NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972) and its progeny.

### *Majority of Employees*

■ When a new owner purposefully discriminates against former employees to avoid becoming a successor, the union's continuing majority is presumed. *U.M.W. of America Local Union 1329 v. NLRB*, 812 F.2d 741, 743 (D.C.Cir.1987); *Kallmann v. NLRB*, 640 F.2d at 1100–01;

*Shortway Suburban Lines, supra; State Distributing Co., Inc.*, 1986–87 C.C.H. N.L.R.B. Para. 18,523, 282 N.L.R.B. No. 151 (February 5, 1987); *Inland Container Corp.*, 119 L.R.R.M. 1089, 275 N.L.R.B. No. 60 (May 7, 1985).

> The evidence here indicates that, but for the employer's unlawful discrimination, all of the former employees would have been retained. An employer may not defeat a finding of successorship through its own discrimination.

*American Press, Inc. v. NLRB*, 833 F.2d at 624–25; *see also NLRB v. Foodway of El Paso*, 496 F.2d 117, 120 (5th Cir.1974).

Even though a majority of ex-employees is presumed, the Court must still examine one other requirement of the successor employer standard, to wit, substantial continuity of operations. *U.M.W. of America Local Union 1329 v. NLRB*, 812 F.2d at 743.

### *Substantial Continuity*

We must begin by examining whether there is "substantial continuity" between the operations of El Mundo, Inc. and that of El Mundo, Corp. This will depend on "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Fall River Dyeing and Finishing Corp. v. NLRB*, 482 U.S. 27, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987).

Finding a company to be a successor is essentially a question of fact and we must focus on the totality of the circumstances. *Id.* 107 S.Ct. at 2236; *NLRB v. Aquabrom Div. of Great Lakes Chemical Corp.*, 862 F.2d 100 (6th Cir.1988). Each case will be decided according to its particular facts and the labor policy at issue. *NLRB v. Jarm Enterprises, Inc.*, 785 F.2d 195, 200 (7th Cir.1986).

The rationale for the successorship doctrine is to promote industrial peace by

---

**2.** Finding No. 32.

avoiding labor unrest or retaliation by dissatisfied employees. *Fall River*, 107 S.Ct. at 2236. "If the Board and the courts failed to bind a successor to the labor law obligations of the predecessor, then the successor could deprive employees of the benefits they previously had won through collective action—a move that might disrupt industrial peace by disappointing workers' legitimate expectations in their terms of employment." *NLRB v. Jeffries Lithograph Co.*, 752 F.2d 459, 463 (9th Cir.1985).

In *Fall River*, the Supreme Court concluded there was substantial continuity between employers because the new company "acquired [from the former owner] most of [the] real property, its machinery and equipment and much of its inventory and materials ... introduced no new product line ... from the perspective of the employees, their jobs did not change. Although [the new owner] abandoned converting dyeing in exclusive favor of commission dyeing, this did not alter the essential nature of the employees' jobs, because both types of dyeing involved the same production process. The job classifications ... were the same ... [the] employees worked on the same machines under the direction of supervisors most of whom were former supervisors...." *Fall River*, 107 S.Ct. at 2236 (footnote omitted).

■ According to the asset purchase agreement executed between respondent and El Mundo, Inc. on November 8, 1987, (Joint Exh. VIII), respondent purchased essentially all the assets pertaining to the former newspaper operation ranging from the accounts receivable, machinery, equipment, motor vehicles, furniture, inventory, office supplies, to the periodicals, newspaper and photo library and research data. Also included in the sale were the computer programs, customer lists and trade names so that the newspaper would still be published under the same "El Mundo" title.

Respondent has also continued to carry out its operations on the same premises pursuant to a lease agreement also executed on November 8, 1987. There is no controversy over the fact that respondent has continued to print a newspaper in the same format as its predecessor.

According to the testimony of Sergio Camero, President and a Board member of El Mundo Corp., the company is divided into five departments: sales, accounting/financing, production, circulation and EDP, which existed "[q]uite close" under the former owner (TR 283).

The biggest change between the two operations has been a drastic reduction in personnel. According to Mr. Camero, 60% of the former positions were reduced. This has been accomplished both by elimination of positions and by replacing employees with independent contractors. From a strictly managerial view, these changes reaped benefits since there has been a 30% increase in production according to Sergio Camero (TR 284).

The evidence indicates that the only major change in operations, apart from the overall reduction of personnel, occurred in the Circulation Department where the distribution of the newspaper was carried out by independent contractors paid on a commission basis rather than by salaried employees. In addition, the fleet of distribution vehicles originally used by the employees was sold. We find that, given the evidence presented, there is probable cause to believe that there has been a substantial continuity of operations.

El Mundo Corp. has continued to operate the same business, with essentially the same jobs, albeit with less personnel and new directors and officers, with practically the same production process, printing the same newspaper and attempting to reach the same customers.

We find that the restructuring of the Circulation Department, the only major modification in the administration of the business, is not so fundamental as to constitute a substantial change from successor obligations. The fact that new supervisors were appointed to the more limited number of positions left is not conclusive either, especially given our finding that El Mundo Corp. purposefully avoided trying to become a successor employer.

■ Cosmetic changes to the organizational structure are not conclusive in determining whether there is substantial continuity of operations. *Aquabrom, supra; NLRB v. Jarm Enterprises, Inc.,* 785 F.2d at 200. It is not the extent of the change but whether it is of a kind that would affect the employee's representational desires. *NLRB v. Jeffries Lithograph Co.,* 752 F.2d at 466.

■ Operational changes intended to make a company into a "bigger and better business" is not the critical factor. For example, transformation of a small operator into a national enterprise has been found insufficient to disprove a substantial continuity of operations. *Id.*

In *Jeffries,* the court upheld a successorship finding where a local print shop was purchased and the new owner created new positions, appointed new supervisors, developed new line products, had different customers and built new equipment around the existing one. It found that despite all these changes, the employees continued to perform their tasks under the same working conditions. The business continued to provide the same product and services, i.e., commercial printing business, even though the scope and distribution of these had changed.

In *Aquabrom,* the new enterprise acquired all the assets of the old company, including the machinery and equipment, continued production at the same location and the employees' functions and conditions remained unchanged. The products and customers also remained the same.

■ The effect any changes in the new business may have on the successorship issue must be viewed from the employees' perspective; that is, whether they view their new jobs as essentially the same. And whether, concomitant with this view, there is an expectancy of union representation. *Fall River,* 107 S.Ct. at 2236. "As a successor an employer is deemed to be operating, from the employees' perspective, the same entity as the previous employer, thus justifying an assumption that the change in ownership has not affected employee attitudes towards union representa-

tion." *NLRB v. Jarm Enterprises, Inc.,* 785 F.2d at 199; *see also U.M.W. of America Local Union 1329 v. NLRB,* 812 F.2d at 743; *NLRB v. Jeffries Lithograph Co.,* 752 F.2d at 464.

We find that, in this particular case, the changes in operations were not of a significant magnitude. This allows us to infer that these changes did not trigger a modification in employees' attitudes toward union representation.

Again, there is no reason to believe that there was a major change in the employees' working conditions. On the contrary, apart from the changes made in the Circulation Department no evidence was presented to establish that there was a change in operations in the remaining four departments apart from the fact that less persons were employed.

### *Hiatus*

■ In rejecting the successorship allegation, respondent gives much weight to the fact that the former operation closed down on August 30, 1987; that the employees received severance pay; and that it was not until January 6, 1988, roughly four months thereafter, that the newspaper was published again.

This argument is unconvincing. A new owner may be found to be a successor despite a hiatus between the closing of a business and the start of another. *Fall River,* 107 S.Ct. at 2237 (substantial continuity despite 7–month hiatus).

According to *Fall River,* this period between operations is but one factor to take into account when deciding the "substantial continuity issue" and will be critical only if there are other factors that point to discontinuity. Thus, we are bound to examine *all* the circumstances.

There is overwhelming evidence indicating that Héctor L. González, the new owner, was negotiating with the former owners the possibility of purchasing El Mundo as an ongoing concern before it closed down at the end of August 1987. He also had frequent and comprehensive meetings with union representatives prior to the Novem-

ber 8, 1987 purchase agreement where they were lead to believe that the newspaper was to continue operating with union employees.

As soon as the assets were purchased by the new owner, and the premises leased, El Mundo Corp. commenced recruiting and training personnel. According to the stipulated facts, between November 9 and December 16, 1987, twenty supervisors, twenty area supervisors and thirty-six employees were hired by El Mundo Corp. Also, policies with respect to salaries and fringe benefits were developed and a new structure was designed for the Circulation Department.

The totality of the events surrounding the hiatus period point to "substantial continuity" between the two employers. During that time the new owner was actively engaged in the sale transaction and in negotiations with the Union. Furthermore, as soon as the sale went through, steps were taken to set all the systems in motion to publish the newspaper within a reasonable period of time.

## DUTY TO RECOGNIZE AND BARGAIN

 A successor employer is bound to recognize and bargain with a predecessor's union otherwise it violates 29 U.S.C. 158(a)(5) and (a)(1). *Fall River, supra; Kallmann v. NLRB, supra; NLRB v. Band–Age*, 534 F.2d 1, 3 (1st Cir.1976); *Shortway Suburban Lines, supra; Inland Container, supra.* Further violation of Sections 158(a)(5) and (a)(1) occur by a successor's unilateral departure from existing terms and conditions of employment by fixing its own terms without first consulting with the union. *State Distributing Co., Inc., supra; Shortway Suburban Lines, supra.*

**3.** *See also* Joint Exhibit X, a letter from Héctor L. González to the Union dated December 21, 1988 advising that inasmuch as he did not purchase a continuing business enterprise there was no obligation to recognize and bargain with the Union. ·

**4.** *See* Respondents' Exhibits E 5(a) and F 6(a) setting forth new fringe benefits and salaries for employees of El Mundo Corp.

There is no controversy over the fact that El Mundo Corp. has refused to recognize and bargain with the Union after it purchased the assets of the former corporation.[3] The evidence also indicates that respondent has instituted terms and conditions of employment different from those established in the collective bargaining agreement executed between El Mundo Inc. and the Union (Petitioners' Exh. 3).[4]

### JUST AND PROPER RELIEF

As already stated, pursuant to Section 10(j), once it has been found that there is probable cause to believe an unfair labor practice has been committed, the Court shall grant "just and proper" relief.

> [S]ection 10(j) ... was meant to provide temporary injunctive relief in every case that could not be effectively remedied through the NLRB's lengthy adjudicatory procedures. Reinstatement of a wrongfully discharged employee ... is a meaningless remedy if it is not ordered promptly.

Note, *The Case for Quick Relief: Use of Section 10(j) of the Labor–Management Relations Act in Discriminatory Discharge Cases*, 56 Ind.L.J. 515, 516–17 (1981) (footnotes omitted).

Section 10(j) seeks to protect the public interest in the collective bargaining process and not the particular interests of the parties involved in the proceedings before the Board. Delay in affording a remedy to correct unfair labor practices may result in the union losing its support to the detriment of the bargaining process which in turn affects the entire bargaining unit.[5] *Aguayo v. Tomco*, 853 F.2d at 749–50; *Asseo*, 805 F.2d at 27–28.

 Temporary injunctive relief pursuant to Section 10(j) will be issued applying

**5.** For reasons beyond our control, namely unexpected complications arising from the *In re San Juan Dupont Plaza Hotel Fire Litigation, MDL– 721*, it was not possible to issue this order earlier.

the criteria utilized for deciding preliminary injunctions petitions. *Id.* at 26; *Maram,* 722 F.2d at 958.

The four factors considered for the issuance of preliminary injunctions are:

1. That plaintiff will suffer irreparable injury if the injunction is not granted;

2. That such injury outweighs any harm which granting injunctive relief would inflict on the defendant;

3. That plaintiff has exhibited a likelihood of success on the merits; and

4. The public interest will not be adversely affected by the granting of the injunction. *Asseo,* 805 F.2d at 26, *citing Planned Parenthood League of Mass. v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981).

 Traditionally, the employees of respondent's predecessor had supported the Union. This support dates back to 19*62* when it was certified by the N.L.R.B. to represent El Mundo, Inc. employees.

The facts indicate respondent has purposely avoided hiring union affiliates and has attempted to shun its duty to recognize and bargain with the Union.

A delay in granting a proper remedy may result in the employer removing union organizers and the Union from the facility, *Aguayo v. Tomco,* 853 F.2d at 749–50.

> If an employer is allowed to continue overt violations of the Act, it may in extreme cases succeed in so undermining union strength as to render ineffective any final relief that might be afforded by the Board.

*Asseo,* 805 F.2d at 27.

We find that the failure to grant interim relief, given these circumstances, will most certainly do away with any pro-union sentiment by those employees remaining in respondent's employ out of fear for their own jobs, which in turn will unfairly affect the bargaining process.

We acknowledge that any interim relief provided will adversely affect respondent's operations. The testimony of Sergio Camero was to the effect that the operation would "become unprofitable" even though he acknowledged that he was speculating

(TR 291–92 and 294). However, we find that given the temporary nature of the relief as well as the irreparability of the harm that may otherwise fall upon the bargaining process, the harm to respondent cannot be any greater than that to the Union. *See Asseo,* 805 F.2d at 28. In short, although El Mundo Corp. may suffer some losses, the alternative (of not granting the injunction) involves the risk of the Union losing its very existence at El Mundo Corp.

There is ample evidence in the record to support petitioner's allegations of discrimination and purposeful avoidance which, in turn, support a finding of a likelihood of success. Juan Colón Ortiz, a supervisor employee, aware of the respondent's hiring policies so testified as well as Roberto Jusino Serrano. There was also the testimony of job applicants corroborating these conclusions.

Furthermore, in discrimination cases it is unlikely that direct or written evidence acknowledging illegal motive will exist. Normally, circumstantial evidence will have to be used to establish motive since the very insidiousness of the discrimination does not lend itself to clear and direct proof.

Inasmuch as any injunctive relief granted would work towards furthering the purposes of the Act by strengthening the bargaining process, we also find that the public interest would not be adversely affected by our ruling. On the contrary, it will be better served. *See Asseo,* 805 F.2d at 28.

### DELAY IN BRINGING CHARGES

 Respondent also alleges that petitioner is precluded from seeking 10(j) relief because of her delay in instituting these proceedings.

Some courts have held that the agency in question is a very busy one and that by the very sensitive nature of these proceedings it should be granted adequate time to investigate and exercise its discretion. Thus, some leeway should be granted and a four-month delay is not unreasonable. *Aguayo v. Tomco,* 853 F.2d at 750; *Maram,* 722 F.2d at 960.

Charges and amended charges were filed by the Union commencing December 29, 1987 through April 26, 1988 in two cases which were consolidated on April 29, 1988 and a complaint issued. The complaint was amended twice, the last time on July 15, 1988. The 10(j) petition was filed on August 5, 1988.

There was a period of not even three and a half months from the time the charges were last amended until these proceedings were instituted. Given these facts, we do not find that there was an inordinate delay.

## CONCLUSION

Based on the foregoing petitioner's request for an injunction pursuant to Section 10(j) is hereby GRANTED.

A. Therefore, it is hereby ORDERED, ADJUDGED and DECREED that respondent, its successors and assigns, officers, representatives, agents, servants, employees, attorneys and all persons acting in concert or participation with it or them, pending the final disposition of N.L.R.B. cases No. 24-CA-5714 and 24-CA-5761 presently before the Board shall refrain from:

1. Instructing its employees to cease engaging in union activities;

2. Threatening its employees with reprisals if they engage in union activities;

3. Informing its employees that it will not hire employees who were members of the Union or that it is limiting its hiring of employees represented by the Union;

4. Informing its employees that working non-union is a condition of employment;

5. Requesting its employees to recruit employees for hire who are not members of the Union;

6. Informing its employees that it will not reinstate those employees whom it had discharged because of their union activities

or that it would prevent the Union from representing its employees;

7. Withholding offers of employment from, refusing to hire, or otherwise discriminating against the former employees of El Mundo, Inc., because of said employees' union activities or in order to avoid an obligation to recognize or bargain with the Union;

8. Failing or refusing to recognize or bargain collectively with the Union as the exclusive collective bargaining representative of its employees in the Administration, Maintenance, Editorial, Production and Circulation Departments, with respect to rates of pay, wages, hours of employment, or other terms or conditions of employment;

9. Unilaterally establishing or changing the wages or other terms or conditions of employment of its employees without first affording the Union an opportunity to bargain over such initial terms, or subsequent changes, to an agreement or a good faith impasse;

10. In any other manner interfering with, restraining, or coercing its employees in the exercise of their rights guaranteed by Section 7 of the Act; and

B. It is further ORDERED that respondent, its successors and assigns, officers and representatives, agents, servants, employees, attorneys, and all other persons acting in concert or participation with it, or them, pending the final disposition of N.L.R.B. cases No. 24-CA-5714 and 24-CA-5761 presently before the Board shall take the following affirmative action:

1. Offer to former El Mundo, Inc. employees listed in Exhibit 10 of the Petition for Injunction on a nondiscriminatory basis, employment to employee positions currently in existence in all departments, displacing, if necessary, any newly hired employees not previously employed by El Mundo, Inc;[6]

---

6. Failure of any of these persons to apply for employment does not preclude their interim reinstatement because given respondent's discriminatory animus it would have been futile for them to do so. See *American Press, Inc. v. N.L.R.B.,* 833 F.2d 621, 627 (6th Cir.1987) (failure to apply resulted from employer's effort to conceal fact that it was hiring). *Shortway Suburban Lines,* 126 L.R.R.M. 1225 (September 30, 1987); *State Distributing Co.,* 1986–87 C.C.H. N.L.R.B. Par. 18,523 (February 5, 1987); *Inland Container Corp.,* 119 L.R.R.M. 1089 (May 7, 1985) Fn. 5, p. 1089.

2. Recognize and, upon request, bargain in good faith with the Union, as the exclusive collective bargaining representative of its unit employees with respect to rates of pay, wages, hours of employment, and other terms and conditions of employment, and embody in a written signed agreement any understanding reached with the Union regarding these employees.

Included in the bargaining unit are: All employees employed by respondent in the Administration, Maintenance, Editorial, Production, and Circulation Departments.

Excluded from the bargaining unit are: Publisher and Secretary, Executive Vice–President and General Manager and Secretary, Administrative Assistants to the Executive Vice–President and General Manager, Director of Management and Information Center, Assistant General Manager, Industrial Relations and Personnel Director and Secretary, Assistant to the Industrial Relations and Personnel Director, Recruiting Officer Treasurer and Comptroller and Secretary, Assistant Comptroller, Internal Auditor's Supervisor, Credit Manager, Accounting Supervisor, Accounting Office Manager, EDP Manager, Assistant EDP Manager, Promotion Department Manager, Advertising Director, Advertising Manager–Sales, Advertising Manager–Operations, Advertising Office Manager, Advertising Agency Coordinators, Special Commercial Supplements Manager, Public Relations Director, Art Director, Security Officer, Security Supervisors, Maintenance Director, Assistant Maintenance Director, Conservation Supervisor, Janitor Supervisor, Electric Engineer Supervisor, Mechanical Engineer Supervisor, Executive Editor and Secretary, Managing Editors, Assistant Managing Editors, City Editor, News Editor, Editorial Page Editor, Associate Editor, Production Managers, Assistant Production Manager, Press Foreman, Mailroom Foreman, Production Supervisors, Photoengraving Supervisor, Circulation Director and Secretary, Metropolitan Circulation Manager, Newspaper-in-the-School Manager, Circulation Office Manager, Transportation and Street Sales Manager, Assistant Transportation and Street Sales Manager, Home Delivery Manager, Assistant Home Delivery Manager, Metro Regional Manager, Island Circulation Manager, Island Manager, Island Regional Managers, Mechanics Supervisor, guards and supervisors as defined in the Act;

3. At the request of the Union, rescind the unilateral changes in the wages and other terms and conditions of employment of its unit employees and restore to its unit employees the wages and other terms and conditions of employment set forth in the collective bargaining agreement between the Union and El Mundo, Inc., until such time as respondent and the Union bargain in good faith to an agreement or a good faith impasse; and

4. Post copies of the District Court's Opinion and Order, in the English and Spanish languages, in respondent's facility at locations where employee notices are normally posted.

C. This injunction shall dissolve automatically upon final resolution of the matters pending before the Board.

IT IS SO ORDERED.